BAILEY v. KIRBY LUMBER CO. (No. 191.)

(Court of Civil Appeals of Texas. Beaumont. April 20, 1917. Rehearing Denied May 16, 1917.)

1. ADVERSE POSSESSION ⟲20—DURATION OF POSSESSION—IMPROVEMENTS.

Where party claims title by adverse possession under the 10-year statute, improvements made by him within the 10-year period cannot be considered.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 106–108.]

2. ADVERSE POSSESSION ⟲97 — EXTENT OF POSSESSION.

Where party claims title by adverse possession under the 10-year statute, and his possession includes portions of adjoining tracts, the location of his home is the controlling factor, and incidental possession on the other tract is not adverse beyond its actual limits.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 537–541.]

3. ADVERSE POSSESSION ⟲114(2) — JURY QUESTION—EXTENT OF POSSESSION.

Evidence that the house and improvements of an adverse possession claimant were on one tract, and only minor and incidental improvements on a second tract, did not make his adverse holding of the second tract beyond the limits of his actual possession a jury question.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 685, 686.]

Appeal from District Court, Hardin County; J. Llewellyn, Judge.

Suit by Preston Bailey against the Kirby Lumber Company. From an adverse judgment, plaintiff appeals. Affirmed.

J. W. Thomas, of Lufkin, and V. A. Collins, of Beaumont, for appellant. Andrews, Streetman, Burns & Logue, of Houston, for appellee.

BROOKE, J. Appellant, Preston Bailey, brought this suit on August 19, 1913, and specifically pleaded title to 160 acres of land, part of the R. A. Irion survey in Hardin county, under and by virtue of the statute of ten-year limitation. Appellee, Kirby Lumber Company, on September 15, 1913, answered by general denial, specially denying each and every allegation in plaintiff's petition, and by cross-plea set up title to 512 acres of

the R. A. Irion survey in the form of trespass to try title as against plaintiff, and also sued G. B. Mitchell on his warranty, but did not state any amount sued for. Defendant, G. B. Mitchell, on October 11, 1913, impleaded John J. Laumer, L. A. Kaupp, and Fred Kaupp, setting out the warranty clause in the deed, but did not sue for any amount or pray for service of citation and judgment. John J. Laumer, L. A. Kaupp, and Fred Kaupp, on December 11, 1913, impleaded W. J. Cannon and Kate L. Cannon as warrantors to the 500 acres, and sued for $1,875. Appellant filed, on April 20, 1916, his supplemental petition, denying all and singular the pleas of all defendants, and specially pleading title under the 10-year statute of limitation to 160 acres out of the 512 acres described by defendant, Kirby Lumber Company, the said 160 acres to include his improvements, to be designated by the court, and in the alternative sues for 10 acres, which he has actually inclosed and in possession. Appellee, Kirby Lumber Company, filed its supplemental answer, denying the allegations in plaintiff's supplemental petition.

The court instructed the jury to find a verdict for defendant, Kirby Lumber Company, for the 512 acres of land sued for by it, less 2 acres, and for appellant, Preston Bailey, for approximately 2 acres, being the portion of said 512 acres which Preston Bailey had under fence on August 19, 1903, and in favor of all defendant's warrantors. Appellant requested the court to submit to the jury, by special issue, whether or not Preston Bailey had peaceable and adverse possession of the property in controversy, cultivating, using, and enjoying the same, for a period of at least 10 years prior to the filing of this suit, as against all persons whomsoever, and correctly defining the terms "peaceable possession" and "adverse possession." This charge was refused by the court. The jury returned a verdict in accordance with the court's instructions, and judgment was duly entered by the court that Preston Bailey recover 2 acres; that Kirby Lumber Company recover 512 acres, less 2 acres; and that all warrantors go hence and recover their costs against the one impleading each of them. The judgment further provides that the plaintiff should have and recover of Kirby Lumber Company all costs by him incurred. Appellant filed a motion for new trial, and no other assignments of error were made than as contained in this motion. The court overruled the motion for new trial, plaintiff excepted and gave notice of appeal. Appellant filed his exception to the court's charge, and also took his bills of exception to the refusal to give his special charge duly submitted within time; he also filed his appeal bond, and the case is properly before this court.

Appellant has grouped his assignments 1 and 2 as follows:

(a) "Because the court erred in charging the jury to find for the plaintiff only 2 acres and for defendant as to the rest of the land, in that under the facts and law it was a question of fact for the jury to determine if the plaintiff should, under his plea of limitation, recover 160 acres of land, to include his improvements, for the proof showed that plaintiff had for more than 10 years had and held peaceable, adverse possession of the land sued for by him, cultivating, using, and enjoying the same for more than 10 years, thereby perfecting title in himself under and by virtue of the statute of limitation."

(b) "Because the court erred in not submitting for the determination of the jury the issue of whether or not the facts that plaintiff had and held peaceable, adverse, and continuous possession of the 160 acres of land sued for by him, cultivating, using, and enjoying the same for a period of more than 10 years before the commencement of defendant's cause of action herein, for such issue was for the jury and not the court, and that the evidence showed that plaintiff took such peaceable and adverse possession of said land on July 10, 1903, and same was continued by the use, cultivation, and enjoyment of same, continuously for more than 10 years before the commencement of this suit, and before defendant's cause of action herein was begun, and such facts of adverse and peaceable possession being of a character to place the defendant and others on notice thereof, were for the jury to determine, and not for the court to pass upon."

The proposition advanced by appellant under the foregoing assignments is:

"That this is not an encroachment case, for the reason that when appellant took actual possession of the Irion survey, and begun actual use of the land sued for, he did not own any adjoining land; therefore the 2 acres he was occupying, coupled with his adverse claim and use thereof for more than 10 years, and the enlargement of his improvements from time to time, raises an issue of fact for the jury, as to whether or not title was thereby perfected in him to 160 acres, including his improvements."

The contention of appellee is set forth in four counter propositions as follows:

(a) While the fact of possession and the intent and purpose with which it is taken and held are questions for the jury, yet what character of facts or requisite are sufficient to entitle a party setting it up to the protection of the statute of limitation is always a question of law.

(b) Any possession of a tract of land, which, in its external manifestations, is but subsidiary and incident to an adjoining possession of another tract of land, as a matter of law is insufficient as a basis for the acquisition of title by adverse possession under the statute of limitation to more land than is actually so possessed.

(c) Where an adjoining owner or claimant in possession, with his home or place of residence on another survey, encroaches, either through mistake or design, upon an adjoining survey, through the medium of an inclosure, or otherwise, and thereby subjects a portion of the adjoining survey to a use, which, in its external manifestations, is merely subsidiary and incidental, and therefore referable to the home and place of residence, such encroaching possession and use is, as a matter of law, insufficiently distinct to afford a basis for the acquisition, under the statutes of limitation, of more of the adjoining survey than is actually so possessed and used throughout the statutory period.

(d) Inasmuch as the undisputed evidence shows that the plaintiff, Preston Bailey, under a contract of purchase, constructed upon the John Thompson survey adjoining on the east the R. A. Irion survey in dispute, his home and place of residence, and that in connection therewith he occupied and used an adjoining portion of the Irion survey, the estimates as to the quantity of which vary, but did not exceed 2 acres, using such portion of said Irion survey for a chicken house and yard, cow pen and garden, all of which were subsidiary and incidental and referable to the home use on the Thompson survey, and that no further occupancy or use had, for the statutory period of 10 years before the filing of the defendant's cross-action, been had by the said Bailey on the said Irion survey, it was proper for the court to direct the jury, as was done, for the reason that such possession and use of the Irion survey did not constitute that notorious, visible, distinct, and hostile possession contemplated by the statute of limitation, did not, in its external manifestations, evidence any intent on the part of the plaintiff, Bailey, to claim more land than was so actually used, was upon its face merely auxiliary and incidental and referable to the adjoining home use, and wholly insufficient, as a matter of law, to apprise the true owner of the land that any claim was thereby being asserted to more of said Irion survey than was so actually used and occupied.

It would, perhaps, be instructive to state the testimony of the appellant, viz.:

"I am plaintiff in this case. Along about the first days of July (1903) we went there and went to work; we had no home: nowhere to live, and didn't own a piece of land in the county. I worked at the sawmills, and couldn't make a living. I had been knowing this R. A. Irion piece of land ever since spring of 1886, and knowed it continually, and had heard of nobody claiming it at all, and when I heard of a party in Fuqua had a claim on a tract on the John Thompson, adjoining it, I asked him to buy a piece of the Thompson, and he had no title to it, but he said that he was trying to get a title to it, and provided he got this title he would sell me 5 acres, and he was to get this title by the 1st of September of that year (1903), so I went there and went to work, and I cleared it all about the same time. I straddled the line, and as soon as I got room for my house I started to building. I was going to set up limitation; that was my intention to set up limitation on the R. A. Irion, as I had not heard of no one claiming it whatever. And as soon as I got ready to build my house I got Mr. Rye to haul my lumber, for I had no team and nothing to haul my lumber, and he hauled some of it that I wanted to build a chicken house, and as soon as I got enough room cleared up on the Thompson why I started to building my house. We didn't get the house nothing like finished; we just covered the two rooms in the house, and never floored it; we moved into the house without flooring in it, and I finished it myself as best I could. We didn't have nothing to live on, so I have been working and clearing that land ever since, and I have never heard nobody else claiming it, and I have tried to put up a good limitation claim. My understanding is 10 years would give me title to 160 acres. We built a chicken house; it was a small one, something like 8x10; but we didn't use it for chicken house; I put a shed on one end, and separated it from the chickens, and used the shed for the horses. As soon as we would get time, some time in September, might have been 1st of September, I had about an acre and a half or 2 acres cleared up; I wanted to get a house so I could make a living; some time in October we had a garden there that I cleared, and I kept on adding to this piece of land. I didn't have

any money, so I had to build the house by myself, and to tell you the truth about it, it ain't completed yet. I had to work to make a living, we didn't have nothing in the world, and we have been there 13 years. I first built a hen house on the Irion. In October we put a garden in; the next year planted sugar cane; in the spring we put in corn and potatoes and such as that and my wife would work it while I would be out trying to make a living. This land has been under fence ever since I went there. The first fence I built it on the original east line of the Irion; I built a picket fence, but the balance of the fence, the other three strings of the fence, I built out of split rails; there had been a lot of timber down in the woods, and I went over the woods and split the posts, and made my fence out of posts and those rails. It was either the year 1907 or 1908 when the panic was on that I got a chance to have the land cleared. There was something over 7 acres that I had cleared; there was a postmaster down at Fuqua that I was acquainted with, so I had taken the figures to him, and he figured it out, and I paid for something over 7 acres, and this was added in to what I had, and I 'run a cross-fence right on through; completed this fence to the corner out of posts and rails. But then I bought some lumber; I got to where I had a little money and a little time to spare; I was working, so I bought some lumber and built three of the strings of the fence out of plank, but that main string was made out of rails and posts. All of the improvements that I speak of is on the Irion survey. While I had a contract to buy the 5 acres on the Thompson from Mr. Hill, provided he got his title cleared, the reason I undertook to hold some land on the Irion was because there was nothing certain about getting his title to that 5 acres straightened up by the 1st of September. And besides, I didn't know that there was anybody claiming the Irion. And if he didn't get his title to this land cleared up I could move my house over on the Irion, and if he got his title cleared up I would let my house remain on the Thompson. After the mill opened up there I went to trying to make a living. I claimed 160 acres of that land; just what the law allowed me. When I filed this suit the 10 years had expired. I have been living in the house there for about 10 years in July; somewhere about 22d of August, 1903—I mean July. I went there and commenced claiming this Irion survey before this contract was drawn up. The date of the contract is July 22, 1903. I had already moved on the Thompson before this contract with Hill had been drawn up, and was claiming the Irion. The contract is with reference to the John Thompson survey. I have title to that now. We offer this contract, which reads, to wit:

"'This indenture of contract of agreement, made this 22d day of July, 1903, between Joe A. Hill and wife, of Liberty county, Texas, parties of the first part, and Preston Bailey, of Polk county, Texas, party of the second part, witnesseth: That whereas, said parties of the first part expect to complete a land deal with the Kirby Lumber Company of Houston, Texas, in September, 1903, requiring a survey and exchange of deeds between said parties of the first part and said Kirby Lumber Company, whereby said Hill and wife will obtain a good fee-simple title to (60) sixty acres of land out of the original Thompson survey in Hardin county, Texas; and whereas, said Joe A. Hill and Ann Hill, his wife, have agreed to sell and convey unto Preston Bailey five (5) acres out of said 60 acres of land as hereinbefore described, for and in consideration of $10 in cash to be paid by said party of the second part to the said parties of the first part in September, 1903: Now, therefore, this indenture further witnesseth, that said party of the second part can improve and occupy such part of said 60 acres of land as could be

covered by field notes for 5 acres, immediately provided he occupies and improves that locality verbally designated and allotted to him by the parties of the first part, and shall upon tender of good warranty deed from said parties of the first part pay to them $10, but in case of default on their part he shall not be evicted or dispossessed without full damages and reimbursement of all he spends or work he may perform on said premises; or in case of default on the part of said Preston Bailey in the payment of said $10, or should he refuse to locate within the limits pointed out on the ground by the parties of the first part, then this instrument shall be null and void and constitute no bar, cloud or flaw upon their title to said 60 acres of land.

"'In witness whereof we have hereunto set our hands and seals this 22d day of July, 1903.
　　　　　　　　"'Ann Hill.
　　　　　　　　"'J. A. Hill.
　　　　　　　　"'Preston Bailey.
"'Witnesses: Charles Howes as to Joe A. Hill and Preston Bailey.
"'Witnesses as to Mrs. Ann Hill: Ann Hill. Charles Howes.
"'State of Texas, County of Liberty.
"'Before me, the undersigned authority, personally appeared Joe A. Hill, Mrs. Ann Hill, his wife, and Preston Bailey, to me known to be the persons mentioned in the foregoing instrument of writing, who severally acknowledged to me that they executed the same for the purposes and consideration therein expressed. Witness my hand and seal this 25th of July, 1903. Charles Howes, Notary Public in and for Liberty County, Texas. [Seal.]
"'Filed for record March 17, 1904, recorded in Book 31, page 284, Deed Records of Hardin County, Texas.'
"No one has ever sued me or tried to put me off of that land since I have been there."

## On cross-examination, he testified:

"Yes, I built on the Thompson before I signed said contract. I went on the land because he promised it. I was living in the house when the contract was signed up. It was sworn to in Polk county, which was a mistake, as I lived where three counties cornered, and most people didn't know which county they were living in; I was living in Hardin and knew it, and in the house on the Thompson survey; that contract saying Preston Bailey of Polk county is a mistake. I went to Fuqua to execute that contract. Q. The contract says if title to the land on Thompson proves good they will make you title and you pay for same, and if it fails you will be paid for what you put on it? A. Yes, sir; that is all the land I claim on the Thompson; in 1908 I bought from Mr. Hill 15 acres, including that 5 acres. I got a good title from Mr. Hill after they gained it. I went to Mr. Hill and bought 15 acres more in 1908 after he got a good title to it. I knew it was a good title in 1908, and know it now. I have not been claiming the Thompson under limitation, but am claiming it now, and for more than 10 years, and claiming it as mine since I got the title to it; after I bought it could not help from claiming it. The reason I built my house on Thompson instead of on the Irion, because they promised a deed to that 5 acres in September, 1903, provided they got a title, and my idea was that if they failed to get a title I knew that we could move over on the Irion, as I was claiming that land, so I built my house there, and if they failed to get a title I would move over on the Irion. The reason I did not build on the Irion and run my fence over part of the Thompson was that I was running a risk of getting limitation. I was running a risk on the Thompson just for 5 acres. I did not agree to pay for that 5 acres. I would be out the lumber, time, and trouble in building if I had placed the house on the Irion, and the same on the Thomp-

son. I knew an adverse claim was made to Mr. Hill on Thompson. I did not know that anybody was claiming the Irion survey. And I thought it just as cheap to lose all I had on the limitation claim. Q. But if you got on the Irion all you would have lost would have been just what you put there? A. What would I have done for a home then? I wouldn't have had a limitation claim. I wanted them to make me a deed in September, just as soon as they got a good title. I wasn't going to pay for the land until I got a good title. I claimed that survey [Irion] under the law of limitation; I went there with that intention. I hadn't bought it from anybody. I had no deed; nobody sold it to me; nobody sold me their claim; I just went there with the intention of claiming it by limitation; that is my reason for going there. The house on the Thompson is not finished yet; I moved into the house with just two rooms covered and not even floored; I went in it, and have been trying to finish it ever since. I moved there on July 10th; went to work on the house July 10th. The house ain't finished yet. It took not over 10 days to finish house at that time; the first house I built on the Irion was a little house 8x10; maybe 10x12; that was built before I moved there and built my house. I cleared up 1½ or 2 acres; would say as much as 2 acres, including the improvements on the Irion. I worked on the clearing all the fall, finished in the winter, then had 1½ or 2 acres; had one-half acre on the Thompson, and something like 2 acres on the Irion; that clearing was right along together; it was fenced."

Defendant here exhibited a map, hereto attached, marked Exhibit A, with reference to which witness testified:

"Black mark A B is the line between the Irion and Thompson survey. The black rectangular thing, that was built when I went on the land—was my house. I began to straddle the line and cleared both ways; cleared on both sides of the Irion survey; part of the clearing was on Thompson, and part on Irion. I cleared about 2 acres on Irion and one-half acre on Thompson; fenced it immediately as cleared it, and at same time built chicken house, and run cross-fence through there. First thing I built was the chicken house; it is southeast from the house; it was on the land fenced and cleared; I have moved the fence several times; fenced all the land cleared; fence completed in September or October 1st; put the fence on the Irion land some time about July 10 or 20, 1903, for because just as soon as I got a place big enough to build a house I started building and fencing. The first fence I placed on the Irion line was that fence that inclosed the chicken house; that much of it did; got from the house to the chicken house through a gate; this gate went right through the Irion line; went over onto the Irion survey, where the chicken house was. I didn't fence all the 2 acres at one time. I completed that by the middle of September or 1st of October; completed the clearing by that time. There was about then 2 acres on the Irion, and about three-fourths of an acre on the Thompson, all the clearing on both all together, had every foot of the land cleared fenced; had to go through gate from house on Thompson to chicken house on Irion; there was a cross-fence between the Thompson and Irion clearings or improvements. I built all these fences at once. I completed the fencing along the yard fence on about July 20th; that is part that took in chicken yard; first you understand I fenced in the 2 acres, but as I got time I would extend the fence on until I completed it to the corner. I built the cross-fence which cut off that part of the clearing on the Thompson from that on the Irion. I completed this all about the same time. I finished that string of fence right about the 20th of July. Completed the cross-fence about middle of September or October. I got from the clearing on the Thompson to the clearing on the Irion through a small gate. This gate led into the chicken yard. Had two gates all the time; one on the front and one on the back leading from the chicken yard. That clearing on the Irion was all on the same clearing. I completed the chicken yard as I went; fenced in the chicken yard first, then had a gate to come from Thompson over into the chicken yard. I never moved this cross-fence; just extended my fence as I went; that fence on the line forms one line or one side of chicken yard, and one line of the yard around my house. After I completed the chicken house that fall I fenced off the cow lot, cow shed, like it is now; fenced that field and cleared it that same spring and winter of 1907 or 1908; no part of this cow pen and cow lot and new field were fenced before 1907 or 1908; that includes the cross-fence. The new field was cleared some time about 1907 or 1908. I put the cow shed and two cribs down the Fuqua road on the north side of the road in the winter of 1904; the first shed was built in 1904; none were built before the first of 1904, except the lot; this built about 3d of October, 1903. The cow pen was built right after January, 1904; there were other improvements there before then; cleared the land, built the shed and crib in 1903; none of the buildings were built before 1903; none built before October, 1903; had none of the new field, marked 5.26° acres, fenced before 1907. The only improvements I had on the Irion before October, 1903, was the chicken house and about 2 acres cleared and fenced. This was where I had the cow lot and chicken house. There on the plat where it is shown the cow lot, cow shed, that is the only land I had cleared before October,

195 S.W.—15

1903; the other improvements I had there on the Irion before the 1st of October was the chicken house; that is all. Then all I had on the Irion prior to the 1st of October, 1903, was the clearing I spoke of (2 acres); that is all the clearing I had done; 2 acres on the Irion, and completed the fence not later than October 1st, and had chicken house and fence on it."

Redirect examination:

"At first on the Thompson I put in about one-half acre; by the fall of 1904 I put in about 2 acres or more. I cleared at first about 2 acres on the Irion, and added more to that 2 acres when the panic came on; I hired the balance of the 5 acres cleared up. I have now about 15 acres on the Thompson; it is larger now than the field on the Irion, but it wasn't when I went there; it wasn't larger in 1907; it isn't an older field on the Thompson than on the Irion. I cleared the field on the Thompson and Irion at the same time. I have an orchard on the Thompson. I have about 8 or 10 acres on the Thompson now on the road; might be a little more. I mean that I have about 12 acres on the Thompson, and about 8 or 10 on the Irion on the road; on both have about 20 acres."

Cross-examination:

"I had that 2 acres by the 1st or middle of October; I mean I had it in by 1st of September. I cleared a long strip along the Thompson along the line; it was between one-half and three-fourths of an acre; the house has four rooms; the two first are sitting east and west; 14x14 with brick fireplace; that would be about 35 feet; then built a dining room and then a 'T' by adding another room; the 'T' run back the length of two rooms; the 'T' extended north; did not make the house extend further east and west; had a hall between the rooms 7 feet. My house is about 16 steps from the Thompson and Irion dividing line. From the front line about 18 feet, taking the ground inclosed that the house is on, that would be about 85 feet, which is less than 30 yards; there is hardly one-half an acre. The house is about 12 feet from the road. My improvements on the Irion was considerably more than on the Thompson, having about 1½ acres on the Irion, and but one-half acre on the Thompson. I added about one-half acre on the Irion by middle of October. This one-half acre cleared after first; had all on Thompson fenced up to this time, fenced all at same time. I finished that three-fourths acre on Thompson about 1904, and finished on Irion by the middle or the first of October. I got it all cleared on Thompson in the winter; I mean in summer of 1904; have not cleared any more; that half acre finished on Irion in middle of September or 1st of October (already had 1½ acres); had about one-half acre on the Thompson; did not cultivate it in 1903; did cultivate and use on the other side of line over on Irion, such as cow lot and cow pen; later cleared the rest about July, 1906. The clearing before that was right in front of the house, about 4 feet from the original line of the Irion, on the Thompson; that road was a settlement road running from Fuqua to the settlement; it runs to the north of the patch on the Irion. I penned the cows on this Irion; made that use of it in 1903; did not add to the piece north of the road. I used the lots and sheds; my barn is still there; had no field on this part; this shed and lot was built about October; as we were going to plant a garden and plant turnips that fall about October 1st, then we planted the garden in the spring, and in 1904 I built that other shed joining the two pens. The oil well was put down across Menard creek later on. I extended my lot fence to about Menard creek in 1905; then put up a little crib and tore down the first smokehouse, which I used for a hen house and added to the other to make room for the horses in front; I made the

horse lot larger; then in 1906 I made the lots and sheds larger and used for the cows; then I built those sheds and cribs; that is all the buildings except the wagon shed. They are all on the north of the road (on the Irion), except the wagon shed is on the Thompson. There is about one acre north of the road on the Irion out on the Fuqua road; that north of the road separately fenced did not join to my other field on the Irion or Thompson; that was there all the time; it was there in 1903 and completed; I used it every year beginning with the year 1903. When I erected those improvements north of the road there had been more improvements on the Irion than there had been on the Thompson. At the time that I began to make those improvements I didn't have no title to the Thompson; I never acquired my title until some time after that; the first 5 acres when the court gave its decision; on April 3, 1907, was the date; and I acquired title to 15 acres instead of 5 acres. I enlarged my improvements on the Thompson in winter or fall of 1904; I just cleared another acre east. I added to the 2 acres on the Irion in the fall of 1907 or 1908; that is when I paid for 7 acres being cleared; in addition to this 7 acres I had 2 acres on the Irion, making in that one field about 10 acres; Mr. Charlie Hanson, who was postmaster and justice of peace at Fuqua, figured up this 7 acres for me, and I paid for the clearing according to his figures."

Redirect examination:

"I own something like 84 acres in all now on the Thompson."

Recalled by plaintiff:

"The cow pen was south and west on east line. This cow pen was a part of the first 2 acres first put on the Irion survey; the 2 acres first cleared included the cow pen; that was cleared before I moved there in order to have a place to put the chickens and cows. I began penning the cows about the second night I was there; the cow pen and all fenced together was about one-fourth acre; that is, cow pen, chicken house, and patch about one-fourth acres, but the cow pen about 6 panels square; I used that continuously every day and night; kept chickens by day and cows by night; kept chickens in there at night because that was one more wild country when I went in there. I used the cow pen as a garden after I turned the cows out. Yes, sir; I began building the cow pen and hen house before I moved there; it was something like 21st or 22d day of July, 1903. I carried the cattle there with me; I kept the cows in the pen and kept the chickens in the house. I don't recollect when I planted the first seed. It was a pretty thickety place, and we had a very short time to prepare it for a garden. The cow pen was inclosed with the 2 acres; had enough outside of the cow pen for a chicken house. I planted that little patch in October. It was a fall garden."

Cross-examination:

"The first string of my fence around the cow pen and chicken house was pickets, and the balance was made out of rails; it had a gate to come in from the chicken pen; the other picket fence is the one around my house; that is, this picket fence formed part of my yard fence, and had a gate leading into the chicken yard and cow pen; the cow pen was fenced off from the chicken yard."

[1] It will be seen from the testimony, about which there is no dispute, and from the additional maps which are marked "Barfield's Sketch" and "Bailey's Map," hereto attached, that the improvements north of the

BAILEY'S PLAT – EXHIBIT B.

ROAD

BAILEY'S HOUSE

A
COW PEN
CHICKEN YARD

GATE

IRION EAST LINE

FENCE TO HERE IN JULY

IRION        THOMPSON

BARFIELD'S SKETCH – EXHIBIT C.

N ↑

ROAD

C

BAILEY'S HOUSE

GATE
A

B

A – LITTLE FIELD ON IRION
B – " " THOMPSON
C – LOT NORTH OF ROAD

THOMPSON

IRION

IRION EAST LINE

road to Fuqua were not constructed until some time about the 1st day of October, 1903, and therefore they can play no part in the decision of this case, because they did not exist for 10 years prior to the filing of defendant's cross-action, which was on February 15, 1913. The same is true of what is designated on the plat as the new field. This, under the undisputed evidence, was not put in until 1907, and therefore did not exist 10 years before the filing of the cross-action. It is best that these facts be kept in mind.

[2, 3] In the case of Charle v. Saffold, 13 Tex. 111, which is one of the earliest announcements of the law with reference to limitation in Texas, the following language is used:

"It thus appears that naked possession will secure title for 640 acres, without inclosure, or 1,000 or 2,000 with inclosure, and the circumstances under which the possession is taken are altogether immaterial to the right, provided the occupant claim for himself and adversely to others. No matter how tortious or wrongful may be the seizure, if possession be continued for the time limited by statute, it will give title preclusive of all claims. If tortious possession without title will give property, why should possession under color of title be required to be substantially bona fide or held under a lawful title? In the first case no question is made or open relative to the bona fides or mala fides of the possession."

Following this in the case of Craig v. Cartwright, 65 Tex. 422, Judge Stayton uses the following language:

"A possession which operates a disseisin or dispossession of the true owner, if continued for the period and under the conditions prescribed by the statutes, confers upon the possessor title to the thing possessed. Is it requisite that notice of the limits to which the disseisor claims shall be given, otherwise than as this is done by an open, visible, and notorious possession, in order that limitation may run as to the land not actually occupied? We think not, under the laws of this state. Under the fifteenth and seventeenth sections of the act of February 5, 1841, the holder of the inferior title might put his written muniments of title, or that which is generally understood to constitute color of title, in his pocket, never put them upon record or give notice of them otherwise than does his possession, and yet limitation would run in his favor to the full extent of the boundaries fixed by his written muniments of title."

While the law, as laid down in these cases, has continued and is recognized by the courts of this state to be the law at this time, nevertheless, we do not understand that these or any of the cases cited by appellant hold to or announce the doctrine in opposition to the one announced by appellee. In other words, while the law is as stated in the cases supra, nevertheless since those decisions were announced, the cases of Bracken v. Jones, 63 Tex. 184, Holland v. Nance, 102 Tex. 184, 114 S. W. 346, Bender v. Brooks, 103 Tex. 329, 127 S. W. 168, Ann. Cas. 1913A, 559, and numerous others have been handed down, in which we understand the rule to be as stated by the appellee, to wit, that where an adjoining owner or claimant in possession, with his home or place of residence on another survey, crosses, either through mistake or design, upon the adjoining survey, through the medium of an inclosure, or otherwise, and thereby subjects a portion of the adjoining survey to a use, which, in its external manifestations, is merely subsidiary and incidental to, and therefore referable to, the home and place of residence, such encroaching possession and use is, as a matter of law, insufficiently distinct to afford a basis for the acquisition, under the statutes of limitation, of more of the adjoining survey than is actually so possessed and used throughout the statutory period.

In the case of Bracken v. Jones, 63 Tex. 187, announced at the same term of the court and within a few days after the case of Craig v. Cartwright, the opinion being prepared by Chief Justice Willie, the following language is used:

"The case is different when one settles upon the land of another, claiming under a recorded deed, and having his improvements located within the bounds called for in such deed. Then the true owner has notice of the extent of the claim of his adversary, and that the improvements are upon it as well as upon his own land, and that, if continued for the requisite period of time, they will give title to the extent of the land described in the recorded instrument. He knows the consequences of such possession, and must provide against them. * * * But suppose such a possessor should, by accident or otherwise, have a small portion of his improvements beyond the line of his boundaries, as claimed in the deed. Is he to get to the limits of his deed by 5 years' possession, and 640 acres besides by reason of his slight extension of improvements beyond his line? If so, he would recover far beyond what a 10 years' possession, under the law we are considering, would give him. The extent of a recovery in such case, over and above the 640 acres, is the amount actually covered by the inclosure of the trespasser. * * * In the case of Mooring v. Campbell, 47 Tex. 41, this court considered that the state of case most prominent in the minds of the legislators in enacting the foregoing provisions of our statute of limitations was the case where one person is in adverse possession with all of his improvements on a large tract of land belonging to another. 'Any flexibility,' it was said, 'in adapting the statute to a state of facts variant from this must be arrived at by construction.' And Chief Justice Roberts, after alluding to the strange, if not unreasonable, consequences of allowing one person to acquire 640 acres of land from his neighbor by merely a strip of adjoining land in a field belonging to the former, says that we must confine 'the construction of the statute to the particular facts of each case.' In view of the particular facts of this case we do not feel disposed to hold that the appellant has acquired 640, or even 160, acres of the Rogers tract by merely inclosing 4 acres within a field with public land upon which he had settled, or even by continuing that small amount within the field after he had perfected a pre-emption right to the public land."

In our judgment, this is a strong holding of the Supreme Court, and language which can but argue for the reasonableness and justness for the rule contended for by appellee. This case of Bracken v. Jones was followed by the Supreme Court in the case of Holland v. Nance, 102 Tex. 183, 114 S. W. 346.

The following language is used in the Nance Case:

"When a party has actual possession of a portion of a tract of land, and has a deed for it upon record, that record is notice to all those who claim in opposition to him as to the character of his claim and the extent of it, but without possession adverse owners are not charged with notice of the fact that the deed is upon record or that any claim is made to the land. Before Nance procured the deed and placed it upon record, his possession meant to the true owner of the Latham survey that Nance was claiming nothing beyond his fence. After the recording of the deed the possession was the same and gave no notice of a greater claim."

The court then refers to and cites the case of Bracken v. Jones, with approval, as authority for the holding in the Nance Case. Continuing the court says:

"It would seem that, when one purposes to hold the land of another, which he has never occupied nor inclosed, by virtue of the statute of limitations, it should appear that he has exercised some acts of ownership over some definite part thereof calculated to apprise the owner that he is asserting 'a claim of right' thereto, and the extent of that claim."

In that opinion the court also says:

"Where a party, through mistake, as in this case, includes within an inclosure a portion of an adjoining tract, not intending to claim adversely to the owner thereof, such possession does not extend to the portion not included, and the continuance of such possession for any length of time will not give, by limitation, title to the land not embraced in the inclosure."

In the Nance Case also the court says:

"The question for our decision, therefore, is whether or not title by limitation results as a matter of law from the facts stated by the trial judge and the further undisputed facts of cultivation and payment of taxes."

Also in the case of Bender v. Brooks, 103 Tex. 334, 127 S. W. 168, Ann. Cas. 1913A, 559, Judge Brown, rendering the opinion, used the following language:

"The evidence is sufficient to raise the issue of limitation of 5 years, if the character of the possession was adverse to the true owner of the land. To simplify the question we will consider it as if Mason had been in possession in person. In order for possession to be adverse to the true owner it 'must be of such a character as to indicate unmistakably an assertion of claim of exclusive ownership in the occupant.' * * * In the case now before us, as in the case just quoted, the house and all improvements except a portion of the fencing was upon another tract of land. The use of the field was incidental to the use of the house and the possession of the field in its entirety could be referred only to the possession of the house and the other land inclosed within the field. The inclosure gave not the slightest intimation to the true owner that the person who was residing upon the 30 acres of the adjoining tract was setting up claim to the entire * * * 663 acres. The evidence does not tend to prove a possession adverse to the owner of the Dunman survey. We therefore hold that the evidence submitted with this certificate did not justify the court in submitting the issue of limitation to the jury."

It is asserted by appellant that the former holding of this court upholds his contention, and cites the case of Village Mills Co. v. Houston Oil Co., 186 S. W. 785. In the Village Mills Case the following language is used:

"The decisions and text-books are unanimous in declaring that in determining what constitutes adverse possession that such possession must be: First, actual; second, visible; third, exclusive; fourth, hostile; and, fifth, it must be continued under a claim of right during the time necessary to create the bar. * * * 'Adverse possession' must be open and notorious possession. In order to make a good claim by adverse holding, the true owner must have actual knowledge of the hostile claim, or the possession must be so open, visible, and notorious as to raise the presumption of notice to the world that the rights of the true owner are invaded intentionally, and with the purpose to assert claim of title adversely to him, so patent that the owner could not be deceived in the exercise of ordinary prudence, over the true situation. The general rule deducible from the various authorities and text-books on the subject is that in determining whether possession is open, visible, and notorious, so as to charge the owner with notice of an adverse claim, the nature, situation, and use of the property are to be considered, as well as the quantity or proportion of the land actually occupied. It is therefore difficult or impossible to specify the acts which would under any and all circumstances and conditions constitute open and visible possession. The authorities seem generally to hold that it is sufficient if the land is appropriated in such a manner as to apprise the community that it is in the possession and enjoyment of the party claiming it."

We do not understand the holding in the Village Mills Case to be obnoxious to the contention made by appellee, or to uphold the contention made by appellant. In the recent case of Houston Oil Company of Texas v. Stepney, 187 S. W. 1082, this court said:

"Since the decision by the Supreme Court in the case of Stevens v. Pedregon, 106 Tex. 576, 173 S. W. 210, there seems to have been created some confusion in the minds of the profession as to the correct meaning to be given the terms 'under a claim of right' as contained in article 5681, which, in defining adverse possession, contains the following language: 'Adverse possession is an actual and visible appropriation of the land, commenced and continued under a claim of right inconsistent with and hostile to the claim of another.' The 10-year statute of limitations of 1841, which remained unchanged until 1879, when the present statute was enacted, did not specially provide that the possession should be adverse, nor was the term 'adverse possession' used or defined in the statute. However, the courts, in construing that act, held that the peaceable possession provided for upon the part of the claimant of necessity must be adverse to the claim of the true owner, and not held in subordination of his title. * * * Mr. Justice Wheeler defined adverse possession as 'an actual, visible and exclusive appropriation of the land commenced and continued under a claim of right, either under an openly avowed claim or under a constructive claim, arising from the acts and circumstances attending the appropriation, to hold the land against him who is seized.' When the 10-year statute of limitations was amended in 1879, and 'peaceable possession' and 'adverse possession' expressly defined, the language of Mr. Justice Wheeler defining 'adverse possession' was almost adopted verbatim et literatim. Since the enactment of the limitation statute in 1841, and since the amendment of 1879, there has been an unbroken line of decisions declaring that it did not matter how tortious or wrongful may have been the seizure of the adverse claimant, if possession he continued for the time required by statute, it would give title, preclusive of all claims."

The court then quotes from the case of Charle v. Saffold, supra, and also the case of Kinney v. Vinson, 32 Tex. 126, and continuing, says:

"The result of the holding of the court in the case of Craig v. Cartwright, 65 Tex. 413, was that, if one entered upon the land of another without right and erected houses and opened fields thereon, continuously occupying the house and using the fields for such purposes as the land is adapted thereto, although a trespasser, still, if this continues or be permitted by the true owner to continue for the period prescribed by the statute, without interruption, this 'naked trespasser' will, under the law, lose that character, and become the owner of the land."

The court also cites the case of Link v. Bland, 43 Tex. Civ. App. 519, 95 S. W. 1110, as being directly in point on the issue involved in that case, and says:

"That case was a suit by J. W. Link against Richard Bland, in trespass to try title for 640 acres of land in Orange county. The defendant, among other defenses, pleaded the statute of limitation of 10 years as to 160 acres of land sued for, including his residence and improvements, the 160 acres being specifically described in his answer, and disclaimed as to the remainder of the survey. There was a verdict for the defendant as to the 160 acres. Under the first assignment of error the appellant assailed the verdict of the jury and the judgment of the court in that case on the ground 'that the undisputed evidence showed that defendant's possession was not commenced or continued under a claim of right, as required by the statute.' * * * The language of the Supreme Court in the case of Stevens v. Pedregon must be read in the light of the facts which the court was discussing in that case. It is to be noted that the court was considering the statutory definition of adverse possession. Quoting Vernon's Sayles' Statutes, it said: 'Adverse possession is the actual, visible appropriation of the land commenced and continued under a claim of right inconsistent with and hostile to the claim of another. * * * No matter in what jurisdiction the determination of what constitutes adverse possession may arise, the decisions and text-books are unanimous in declaring that such possession, among other things, must be hostile. * * * The naked possession unaccompanied with any claim of right will never constitute a bar. Where a party enters upon land and takes possession without a claim of right, his occupation is subservient to the paramount title, not adverse to it. It is nothing more than a trespass, and, no matter how long continued, can never ripen into a good title. * * * In order to make a good claim by adverse holding the true owner must have actual knowledge of the hostile claim, or the possession must be so open, visible, and notorious as to raise the presumption of notice that the rights of the true owner are invaded intentionally, and with the purpose of asserting a claim of title adverse to his, so patent that the owner could not be deceived, and such that, if he remains in ignorance of, it is his own fault. 1 Cyc. 996 and 1000.'"

We do not see any comfort to the appellant in the holding of this court in the Stepney Case, nor in any or all opinions handed down by this court heretofore.

The contention of appellee is that:

"If these cases mean anything, they mean that in determining whether or not possession is adverse within the meaning of the statute in instances where it is partly on one tract of land and partly on another, the location of the home, the nucleus about which the other concomitants of possession may be gathered, is the controlling factor. They mean that only primary possession is adverse possession, and that secondary or incidental possession which is referable to the primary possession is not adverse beyond its confines. They mean that decisive effect must be given to the external manifestations of the possession, and that possession which is but incidental and subsidiary in its external manifestations to a primary and, therefore, controlling possession, cannot be made the basis of a claim under the statutes of limitations, to more land than is actually so possessed. They mean that possession to be adverse must be distinct, and that possession is not distinct which is but incidental and subsidiary. Such is not only the construction of our limitation statutes given by our Supreme Court, but is manifestly the just and true and fair construction which should be accorded them."

And it is, with great force, contended in this case that it is manifest that such possession as the appellant Bailey had of the Irion survey was incidental and subsidiary to his possession of the Thompson upon which his home was situated. "It was so," it is contended, "in its external manifestations, and it is entirely immaterial in this connection that the appellant may have mentally claimed 160 acres of the Irion under the statutes of limitation. It is equally plain that the appellant avoided taking a possession of the Irion which would be distinct, open, and notorious, and that he, on the contrary, purposely straddled the line between the Irion and the Thompson, subjecting an insignificant portion of the Irion to a purely incidental use under such circumstances as to avoid the appearance of an adverse claim upon his part to the entire Irion survey."

The contentions set out above of appellee must, in our judgment, be sustained. We do not believe that it was a question for the jury to determine as to whether the appellant, appellant having had and held the 2 acres sued for, peaceably and adversely, cultivating and using the same for more than 10 years, that it was their province to determine whether such possession and use was sufficient, as a matter of fact, to place the record owners on notice of Bailey's claim to 160 acres of land, but such issue, in the opinion of this court, was in this case and under these facts a matter of law, and the action of the court in directing a verdict, was without error.

Believing, as we do, that the action of the trial court was correct, and that the appellant has had a fair and impartial trial, the appellant's assignments are overruled, and we are of opinion that this cause should in all things be affirmed. It is so ordered.