NELL B. ADAMS ET AL V. ANNA SLATTERY ET AL.

No. A-5313. Decided November 14, 1956.
Rehearing overruled December 19, 1956.
(295 S.W. 2d Series 859)

434

*Thos. A. Wheat, Pickett* and *Pollan, F. K. Dougharty* and *Bradford Pickett*, all of Liberty, for petitioners, Adams et al.

One who pleads the statute of limitations has the burden of proving same, and when they have wholly failed to make such proof, the court was correct in its action of instructing a ver-

dict for the plaintiffs and the Court of Civil Appeals was in error in reversing such judgment. The Court of Civil Appeals was also in error in holding that the running of the statute of limitation was not interrupted by the filing of the suit, but that to toll the running of said statute due diligence must be exercised in securing the issuance of and service of citation on the several defendants. Bailey v. Kirby Lumber Co., 195 S.W. 221; Coleman v. Waddell, 249 S.W. 2d 912.

*C. B. Cain,* of *Liberty, Orgain, Bell & Tucker, John G. Tucker* and *Will E. Orgain,* all of Beaumont, for respondents, Anna Slattery et al.

The Court of Civil Appeals erred in holding that the evidence was sufficient to raise an issue to be submitted to the jury as to the presumption of a deed from anyone having title. Keys v. Mason, 44 Texas 142; House v. Reavis, 89 Texas 626, 35 S.W. 1063; Bruni v. Vidaurri, 140 Texas 138, 166 S.W. 2d 81.

MR. JUSTICE GRIFFIN delivered the opinion of the Court.

Petitioner, Nell B. Adams et al were plaintiffs in the trial court and respondents, Anna Slattery et al, were defendants. Both parties sought a writ of error to the judgment rendered by the Court of Civil Appeals, and both applications were granted. In order to avoid confusion we will give the parties the same designation they had in the trial court. The action is in trespass to try title to recover 548 acres out of one of the three Conrad Eigeneaur Surveys in Liberty County, being Abstract No. 186, Patent No. 559, Volume 15, less, however, 160 acres in the southwest corner of this Survey which was occupied and claimed by Neville Doucette and his assigns. The defendants also plead a cross-action in trespass to try title for the same land. The survey in suit was patented to the heirs of Conrad Eigeneaur, deceased, on June 30, 1862 by virtue of Certificate No. 555, which was issued to the said heirs by the Board of Land Commissioners of Harrisburg County on June 7, 1838. Plaintiffs claim to have acquired the title of the aforesaid heirs in several different ways. The defendants contend that the plaintiffs failed to prove title and also claim that they, the said defendants, have acquired the title for themselves. The defendants on trial, and the respondents here, are Anna Slattery and Nora Slattery, daughters of Thomas and Kate Slattery. The parents of the defendants died before this suit was filed. Some of the claims asserted by defendants devolved upon them in part by direct inheritance from their parents and in part

through their sister, Mayme Slattery, who died after this suit was filed; but they also claim title under their own adverse possession and that of their sister, Mayme.

The cause was tried to the court with a jury, but at the close of the evidence introduced by both parties, the trial court instructed a verdict in favor of plaintiffs and certain cross-defendants for the title and possession of the land in controversy. On appeal this judgment was reversed and remanded. 279 S.W. 2d 445.

In 1836 a colonist of the Republic of Texas named Conrad Eigen*eaur* (sometimes found spelled Eigen*auer* in the record) was killed at the Battle of Coleto. As such colonist and as a deceased soldier in the war with Mexico for Texas' independence, his heirs became entitled to be awarded certain public lands in the then Republic. On June 7, 1838, Adolphus Sterne, administrator of the estate of Conrad Eigeneaur, procured from the Board of Land Commissioners of Harrisburg County Certificatie No. 555 for one-third league of land. This certificate was issued to the heirs of Conrad Eigeneaur, deceased, by virtue of which Patent No. 559, Volume 15, Abstract No. 186 was issued by the proper authorities of the State of Texas on June 30, 1862 to the heirs of Conrad Eigeneaur, deceased, and their heirs or assigns for 708 acres of land lying in Liberty County, Texas. The land in controversy in this suit consists of 548 acres out of the above patent. The courthouse of Liberty County, Texas, together with all records, except one book of the County Surveyor's field notes, was destroyed by fire on December 12, 1874. The first records of assessment and payment of taxes on property in Liberty County, Texas begin with the year 1895. Such prior records as are available must be obtained from the records of the State Comptroller at Austin, Texas.

The first assessment of this land was made in 1867 to Conrad Eigeneaur, A. W. B. Thompson, Agt.; assessed to A. N. B. Tompkins in 1868; no assessment in 1869; assed to A. N. B. Tompkins in 1870 and 1871; assessed to Jas. B. Simpson in 1872; not assessed in 1873, except fifty acres to John Watson; assessed to J. B. Simpson in 1874; unassessed in 1875, except fifty acres to John Watson; unassessed in 1876, except fifty acres to John Watson, and in 1877 was assessed to Thomas Slattery by B. F. Cameron, Agent. By deed dated May 28, 1877, said survey of land "less 50 acres theretofore sold by James B. Simpson off the northwest corner thereof, together with Lot No. 2, in Block 119 of the Town of Liberty," was conveyed by George A. N. Zabriskie, assignee in bankruptcy of James B.

Simpson, John A. Wallace and J. W. Chisholm, bankrupts, for the Southern District of New York, to Thomas Slattery. Said deed recited that the land described was the same property conveyed to bankrupts by John A. Wallace. Mr. Slattery sent his deed to Liberty County for recording, same being filed for record on June 22, 1877, and recorded in Book C, page 212, Deed Records of said county. B. F. Cameron was County Clerk at the time of the filing of the deed to Thomas Slattery and was also county clerk at the time of the destruction of the deed records in 1874. In returning the deed to Slattery, Mr. Cameron in his letter of June 22, 1877, said, "No one has assessed your land and paid taxes on it since Simpson sold to Wallace."

The records further show that the heirs or representatives of Thomas Slattery paid all taxes before they became delinquent on this land from 1924 through 1931, and from 1935 through the year 1948. Taxes for the years 1932, 1933 and 1934 became delinquent before their payment by the Slattery defendants.

After the death of Thomas Slattery in 1889, his wife and children continued to live in Liberty, Texas, until September, 1903, when they moved to Beaumont, Texas, and were residing there at the time of the death of the mother, and the three children Mayme, Nora and Anna continued to reside and were residing in Beaumont at the time of Mayme's death in March, 1946, and the other two sisters were residing in Beaumont at the time of the trial in 1952.

With regard to the occupancy of the land in suit there is evidence that Thomas Slattery moved to Liberty, Texas, in 1885; that in 1885 or 1886 Thomas Slattery had a pasture and part of the land; that there was a fence inclosing a pasture and a fence around the Eigeneaur Survey that Mr. Slattery claimed; that Slattery ran his cattle and other livestock on this Survey and that Slattery had been seen out there on the place; that the Slattery pasture, known as the "Slattery Tract" was the Eigeneaur Survey "except as to 160 acres in the southwest corner." One witness, born in 1870, testified that he lived for more than fifty years about two miles from the Survey and was well acquainted with the land and it was known as the "Slattery land" as far back as he could recollect and was used by Mr. Slattery as a pasture; that he assisted Major Dark in making a survey of the land in 1885 or 1886 and at that time saw the pasture fence. Other witnesses testified to the then use of the land by the Slatterys for pasture. Several witnesses testified as to the reputation in the community of ownership of the

land as being owned by Slattery. It was shown by evidence produced by plaintiffs and defendants that in 1873 Neville Doucette went on the 160 acres in the southwest corner of the Survey and perfected a claim thereto by limitation. He continued to live there until his death in 1919. He claimed no other part of the land. There was also testimony that Neville Doucette while on the land said at the time Mr. E. B. Pickett fenced a part of said land in 1904 "that the land belonged to old man Slattery and he did not see why Pickett was fencing it." Various witnesses testified to old fence posts and wires remaining on the Survey in 1900 and later. They also testified to the existence and use of the Slattery pasture on the land in 1890, 1891 and its use as a pasture until 1894. The evidence does not show any occupancy of the land from the time defendants' use and occupancy ceased about the end of the year 1893, until 1904. On March 5, 1890, E. B. Pickett, Sr., was appointed temporary administrator of the estate of Thomas Slattery. On November 20, 1890, B. F. Cameron was granted permanent letters of admiinstration on the estate of Thomas Slattery and qualified. Cameron filed an appraisal and list of property of the estate, showing, among other properties, 650 acres of land in Liberty County patented to the heirs of Conrad Eigeneaur and half of Lot 2, Block 119 in the Town of Liberty; six head of horses and twelve head of cattle.

The first claim adverse to that of the Slatterys, as shown by the record, is in the year 1895 when W. Von Rosenberg, purporting to act under a power of attorney given by Margaretha Laemmer et al, dated April 11, 1880 (but not filed for record in Liberty County until 1895) conveyed to S. M. Johnson the land patented under Certificate No. 559, Volume 15 and Abstract No. 186 in Liberty County, Texas. The Laemmer power of attorney was executed by a number of people who claimed to be the heirs of one Conrad *Eichenauer*, a native of Germany who lost his life in the Battle of Coleto in 1836, and who was granted "certain rights to land in the Republic, now the State of Texas." In general, the heirship of the signers of the power of attorney to Von Rosenberg was based upon the statement that Conrad *Eichenauer* was never married and on his death left surviving him his brother, Christoph *Eichenauer*, his only heir, who died November 14, 1850 without issue, or any brothers or sisters, or their issue, but did leave a surviving wife, Margaretha *Eichenauer*, nee Fuchs, who died September 27, 1870. The power of attorney appointed Von Rosenberg their "agent and attorney in fact to enter upon and take possession of any and all lands in the State of Texas to which we are entitled as the

heirs at law of Conrad *Eichenauer,* deceased," with authority to take such action, including lawsuits, compromises, etc. as might become necessary to further the best interests of the heirs and to receive and execute deeds in their names. The Court of Civil Appeals held that the affidavit of heirship was not binding and no point of error is urged in this Court to such holding. The rights of Von Rosenberg under the deed to Johnson, and a contract between Von Rosenberg and Johnson was assigned by Von Rosenberg to Wm. Fuchs, who brought a suit against Johnson in 1901 which resulted in a judgment, April 19, 1902, in favor of Fuchs against Johnson in which Fuchs recovered from Johnson two certain tracts and also the 708 acres covered by our patent, volume and abstract number as the land herein involved. From this 708-acre tract was excepted a tract of 160 acres on the northern line of this tract, and which 160 acres had been conveyed by Johnson on April 13, 1895, and also excepted a 160-acre tract in the western part of this tract which had been recovered in a lawsuit by R. C. McManus against S. M. Johnson in February, 1896. The Court of Civil Appeals held this judgment was invalid because of lack of description of the two tracts which had been excepted. There has been no assignment in this Court to that holding. The assessment record shows that the 548 acres involved in this suit were assessed to S. M. Johnson for the years 1895 and 1896 only. No assessment shows for 1897; in 1898 and 1899 the tract was assessed as owner "unknown." In 1900 through 1902 it was assessed as a tract of 910, 910 and 908 acres respectively to unknown owner. As far as the evidence shows neither Johnson nor Fuchs had possession, use or enjoyment of this land during the time they claimed to own it. In 1903, Wm. Fuchs conveyed an undivided one-third interest in the lands described in the judgment above to Ira P. Jones and in 1909, Fuchs and Jones conveyed to I. A. Stein the three Liberty County tracts patented to Conrad Eigeneaur, less 160 acres out of the 708-acre tract covered by Patent No. 559, Volume 15, Abstract 186. Taxes covering the land in suit were paid by this group of claimants before they became delinquent for the years 1904 to 1923, except for the years 1915 and 1916. In 1909, Stein caused a dwelling to be erected on this land and this dwelling was occupied by Stein's tenants for a period of time in excess of five years. In 1909, after Stein received his deed to the land, Mrs. Anderson (the widow of Thomas Slattery), joined by her husband, and the three Slattery daughters executed a power of attorney to W. N. Dycus, a lawyer of Beaumont, Texas, granting full power and authority to sue for and recover and to take all necessary steps for recovery of all land in the Conrad Eigeneaur Survey,

Liberty County, Texas. The record is silent as to the action taken under this power of attorney, but in August, 1919, Dycus released all rights to Mrs. Anderson and daughters which he might have had under this power of attorney.

In 1912 the State of Texas sued Hattie B. Stone et al for delinquent taxes and a judgment was rendered in this cause against all the defendants on February 11, 1913 for delinquent taxes on this land for the years 1890-1904, inclusive, except the years 1891 and 1895. Under proper execution and order of sale this land was sold on September 8, 1914 to I. A. Stein. Thomas Slattery was one of the defendants named in the suit and against whom judgment was recovered. It is admitted that he died in the year 1889 and his heirs and legal representatives not being parties to the suit, this judgment and sale thereunder could not affect the Slattery title. Stein later brought a suit citing by publication a great number of persons, not naming any of the Slattery heirs but specifically suing the heirs and the unknown heirs of Conrad Eigeneaur, deceased. In this suit Stein, on June 6, 1918, recovered judgment and title and possession of the land sued for which included the land in controversy. The Court of Civil Appeals held that this judgment gave to Stein and his assigns—plaintiffs herein—at least a prima facie title to the land in suit. Defendants attack this holding by proper assignment in their application.

In 1922, Stein brought a suit in the district court of Liberty County, Texas, against Thompson Ford Lumber Company which claimed to be the owner of the timber on this tract of land by virtue of conveyances from the Mahalia Preacher-E. B. Pickett claim hereinafter set out. The Lumber Company brought in all the Preacher-Pickett claimants, and on November 5, 1923 an agreed judgment was entered wherein and whereby the Stein claim and the Preacher claim were merged. Stein recovred an undivided 200 acres and the Preacher claimants recovered an undivided 348 acres out of the 548 acres of land in the present suit. Those who recovered under this judgment have paid all taxes before they became delinquent from 1924 through 1949. The Lumber Company's contract was recognized and it cut and removed the timber on the tract, completing these operations about 1925.

In the year 1903, Hattie B. Stone et al, claiming to be the heirs of Mahalia Preacher, executed to E. B. Pickett, Jr. a power of attorney, coupled with a conveyance of an undivided half interest in the land in suit. In 1904 E. B. Pickett, Jr., act-

ing for himself and the Preacher heirs, caused the land to be fenced and began, through tenants, to use the land as a pasture. There is conflicting testimony as to the duration and character of this use for a period of five years.

In 1904, Pickett, acting under the power of attorney, executed a mineral lease on 400 acres of this land and a dry hole was drilled thereon. Also in 1904, he sold an undivided interest in the whole of 708 acres and joined in the sale of an undivided one-half of the pine timber on the land to McShane Lumber Company. The Lumber Company cut and removed the timber. Immediately following the Lumber Company's completing its timber cutting, Pickett, acting for himself and others claiming under the Preacher chain, placed R. M. Coons in possession of the land and Coons, as tenant, put a 15-acre field into cultivation. This field was cultivated by tenants recognizing Pickett's title down to September, 1941 when the then tenant, Gaston Lloyd, moved from the vicinity of this land to Hull, Texas, and abandoned possession of the land in controversy, which included the 15-acre field known as the Coons field.

In 1919, the Slatterys went on the land and erected a two-room house thereon and occupied and used this house, either personally or by their tenants, until 1929. In connection with the house they dug two wells and had a small garden inclosure. In 1922 the Slatterys caused a small pasture of about 15 acres to be fenced, and in 1924 caused to be fenced in a tract of approximately 45 acres, known in the record as the Markentell pasture. This 45-acre pasture inclosed the small 15-acre "catch pasture" built in 1922. The Markentell pasture was continuously used by tenants of the Slatterys from the time of its construction until after the death of Mayme Slattery in March, 1946, when the outside fences went down in places. In 1941, after plaintiffs' tenant, Gaston Lloyd, quit using the 15-acre Coons-Pickett field, one Fregia, under a previously executed tenancy contract with the Slatterys covering the whole of the 548 acres immediately took over this Coons field or pasture, repaired and erected the broken down fence surrounding this pasture; put in new posts and rebuilt the fences, and as a tenant of the Slatterys continued the use of this Coons field or pasture. At the time the Coons-Pickett field or pasture was taken over, Fregia opened a gate or gap in the common fence between this pasture and the Markentell pasture and used both pastures until the Markentell fence got down to where it was not good enough to turn livestock. He kept the fences around the Coons-Pickett pasture in good repair and continued its use up until the case was tried.

The Slaterys have never abandoned their claim to the land involved. The above is a condensed statement of such of the facts as are necessary to an understanding of our holding in this cause. The opinion of the Court of Civil Appeals [279 S.W. 2d 445] sets out in more detail the facts in this cause, and it is referred to for a more complete statement.

■ Plaintiffs complain in this first point of error of the action of the Court of Civil Appeals reversing the action of the trial court in instructing a verdict in favor of plaintiff. This complaint is urged in two parts. Part A is to the effect that the Court of Civil Appeals erred in not applying the "encroachment" doctrine to the facts of this case. Fregia, defendants' tenant, who lived on the southwest 160 acres of this survey, but not on the 548 acres in controversy, had a field on his individual land which adjoined the Coons, or Pickett field. When Lloyd, plaintiffs' tenant, vacated the Coons field, it is claimed there was no extension of possession or use by defendants' tenant, Fregia, sufficient to put plaintiffs on notice that defendants were asserting title to more of the 548-acre tract than the 15-acre Coons field. It is contended by plaintiffs that the most that could be said of such occupancy was that it was a mere encroachment by Fregia, the owner of the adjoining field, and therefore limitation title could not be matured to any more of the land than was actually inclosed within the Coons or Pickett field; and that no proof having been offered of an accurate legal description of this Coons field no judgment for defendants could have been rendered for the recovery of the Coons field, or for the whole of the 548 acres; therefore, the trial court was not in error in giving the instructed verdict. The trial court having withdrawn the case from the jury and having instructed a verdict for the plaintiffs, the evidence in the record supporting the defendants' position must be accepted as true and all conflicts and inconsistencies must be resolved in petitioners' favor. Trianble Motors of Dallas v. Richmond, 1953, 152 Texas 354, 258 S.W. 2d 60; Air Conditioning Inc. v. Harrison-Wilson-Pearson, 1952, 151 Texas 635, 253 S.W. 2d 422; Fitz-Gerald v. Hull, 1951, 150 Texas 39, 237 S.W. 2d 256; Hoover v. General Crude Oil Co., 1948, 147 Texas 89, 212 S.W. 2d 140; Dunagan v. Bushey, 1953, 152 Texas 630, 263 S.W. 2d 148.

Plaintiffs contend that the doctrine of the cases of Coleman v. Waddell, 151 Texas 337, 249 S.W. 2d 912 and Bailey v. Kirby Lumber Co., 1917, Texas Civ. App., 195 S.W. 221, wr. ref., when applied to the facts next above set out require a holding, as a matter of law, that Fregia's possession of the Coons pas-

ture after 1941 was a mere encroachment on these 548 acres from Fregia's use of his own adjoining land, and, therefore, gave no notice that by Fregia's possession, use and enjoyment of the Coons field, any claim could be made by anyone to the title to the 548-acre tract in suit. In the two cases cited the limitation claimant was not claiming under any "title or color of title" but as a naked trespasser seeking to perfect his title to a part of the owner's land adjoining the land upon which the trespasser resided. The rights of a naked trespasser are not the same as the rights of one claiming under "title or color of title." In our case Fregia was the tenant of the Slatterys under written contract of tenancy, beginning in 1933 and covering the whole of the 548 acres. The Slatterys had a deed to the land which had been of record since 1877. The Slattery deed gave notice to plaintiffs of the extent of their claim to the whole of the 548 acres. When plaintiffs found Slattery's tenant, Fregia, in possession of the Coons field, they knew he had possession adverse to them of a portion of the land which plaintiffs were claiming to own under both the Von Rosenberg and the Preacher title. As said in Randolph v. Lewis, 1919, Texas Comm. App., 210 S.W. 795, "Defendant was in possession of the identical tract of land to which plaintiff asserted title. Plaintiff was therefore charged with knowledge that defendant was in possession of property belonging to him. This fact was sufficient to call the attention of plaintiff to the holding of defendant. Brownson v. Scanlan, 59 Texas 222; Craig v. Cartwright, 65 Texas 413; Wimberley v. Bailey, 58 Texas 222." The case goes on to hold that it was plaintiff's duty to pursue that notice by consulting the deed records of Madison County (where the land was located) although defendant's deed was not in the chain of title under which plaintiff held. When plaintiff had examined the deed records he would have found that defendant was claiming the identical land by virtue of a duly recorded deed. The court then says, "* * * the plaintiff is charged as a matter of law with knowledge of the location of the land owned by him and with its boundaries, * * * "and citing authorities.

■ The fact that the tax records of Liberty County showed that the Slatterys were paying taxes on this identical 548 acres, and had been so paying taxes for the past seventeen consecutive years, was also notice to plaintiffs of defendants' claim to the whole of this land, rather than to only the 15 acres in the Coons field. Another reason that the encroachment doctrine does not apply is that Fregia was not the limitation claimant. His possession, use and enjoyment was by virtue of his being the tenant of the defendants; therefore, plaintiffs had no good reason to

believe he was claiming this 15-acre Coons field through mistake, carelessness or inadvertance as to the true location of his own boundary. See also Brownson v. Scanlan, 59 Texas 222, Tucker v. Angelina County Lumber Co., 1919, Texas Comm. App., 216 S.W. 149; Polk v. Carey, 1923, Texas Civ. App., 247 S.W. 568, wr. dism., w.o.j.; 574 on rehearing; Wheelis v. Maxwell, 1938, Texas Civ. App., 120 S.W. 2d 935; no writ history. We hold that this case is not controlled by the encroachment doctrine.

Part B of plaintiff's first point of error in their application is as follows:

"Respondents (defendants) also claimed title to a tract of some 45 acres, more or less, identified in the record as the Markentell pasture and in the present state of the record the evidence is sufficient to support an affirmative finding of a jury of limitation under the ten-year statute to such 45 acre tract; however, the basis for the motion for instructed verdict in the Trial Court as to the said tract and the ruling of the Court thereon was that Respondents (defendants) had failed, by evidence adduced, to so locate the tract as to show what part, if any, was located on the land in suit and hence, absent such evidence, the Court could not have properly entered judgment in favor of Respondents (defendants) on a favorable finding of the jury on such issue of ten years' limitation."

Mr. Bruce, the surveyor, gave a detailed metes and bounds description of the fence lines of the Markentell pasture, but admitted that he had made no location of the outside boundaries of the Eigeneaur 708-acre survey and that he, therefore, could not say whether any or all of the Markentell pasture was on the Eigeneaur Survey, and, further, that if any of it was on the Eigeneaur Survey, he could not say how much. Mr. Bruce's location of the 45-acre tract makes no attempt to tie the same to any line of the 548 acres involved in this suit, he having made no attempt in his work on the ground so to do, his testimony being to the effect that he did not know the location of the Eigeneaur 708-acre survey on the ground and could not therefore say whether the Markentell pasture was located wholly on the Eigeneaur, or partly on the Eigeneaur, or wholly on some other survey. Mr. Bruce further testified that he had been on the Eigeneaur Survey and had in 1950 caused to be made on the ground a survey of part of the Eigeneaur Survey, claimed by the Slattery women; that the defendants' counsel had requested him to make a survey of the outlines of the Fregia

pasture (the same as the Markentell pasture) and he had Mr. Fregia to go on the ground and point out to him the pasture fences and the survey was made of the outline of the pasture as found on the ground; that Fregia went with him and that the plat tendered correctly shows the location on the ground and the area that the pasture and fences outlined; that Fregia stated to him that the pasture was the Fregia pasture on the Slattery land and identified to him the location of the old two-room Slattery house as shown on the plat as being about thirty years old; *that the field notes he made were such as one could accurately locate on the ground the tract of land within the pasture inclosure.* Mr. Bruce also testified that he made his beginning point at the most southern part of the pasture fence as shown him by Fregia; that the fence on the south and west lines was in good condition, the rest of the fence appeared to be old and down in spots, but is continuous around the whole tract; *that the trees called for by the witness in his field notes are such that any surveyor coming along could follow the lines;* that he could not say personally that the land was on the Eigeneaur Survey; that he took Fregia's word for the fact that it was on the Eigeneaur Survey, along with checking the aerial pictures and other information that locate the Eigeneaur Survey; that the pasture "lies right east and adjoining Fregia's place." The field notes made by Bruce of the pasture inclosure were read into the record and the field notes include and describe the land in the inclosure; however, he could not say that all the lines of the pasture were within the Eigeneaur Survey. He would say, however, that the major part of the pasture was on the Survey and he did not have any reason to believe that any part of it was not on the Survey. Other witnesses testified that the Markentell pasture, identified in the evidence as being the identical pasture taken over from Markentell by Fregia and also later known as the Fregia pasture, was on the Eigeneaur Survey and outside the Doucette tract.

Defendants claimed title to the Markentell pasture under both the ten and five year statute of limitation. The record is undisputed that defendants Slattery held possession of the pastures, using same for pasturing livestock and keeping up the fences so as to turn cattle, from the time they had Markentell inclose the pasture in 1924 until Mayme's death in 1946, after which the fences got down so they would no longer turn cattle. This use and possession was first by defendants' tenant, Markentell, and then by their tenant, Fregia. There is no controversy as to the possession being held under their father's deed, nor that it was not adverse to all the world; nor that anyone,

at any time, made any protest to such use, or made any attempt to eject their tenants until this suit was filed by plaintiffs against defendants in January, 1940. Witnesses other than Bruce testified as to the location of the Markentell pasture.

Plaintiffs' witness, Gaston Lloyd, Pickett's tenant from September, 1937 to September, 1941, testified that he was familiar with the Eigeneaur 708-acre survey and that he owned 22 acres in the Neville Doucette tract in the southwest corner. He further testified that in 1922 or 1923 he built a pasture fence for the Slattery women of about 15 acres; that he knew Buck Markentell and that Buck built a pasture fence in there for the Slatterys; that Markentell put horses in there; that the pasture Markentell built was no part of the Pickett field; the Slattery west fence connected or formed the east string of the Pickett fence; the fence he helped the Slatterys to build and the one Markentell built was on the Eigeneaur Survey and was on the part of same different from the Doucette tract.

Buck Markentell testified that he knew the Eigeneaur Survey of about 700 acres on a part of which Neville Doucette lived and had known it practically all of his life; that he built a fence for the Slatterys on "this tract of land;" that at the time he built the fence the Slatterys were living in the house on the land; that he used the pasture he had built with the permission of and as a tenant of the Slatterys to graze his stock; that he did not make a written lease thereon until September 30, 1930. The lease included the entire 548 acres outside of the Doucette tract, and that at the time of making the written lease he was in possession of the land and had been using it with the permission of and as a tenant of the Slatterys, who were then living on the land; that when "I built the pasture for the Slatterys on the Eigenheaur Survey" the Slattery house was there.

Eugene Fregia testified that he lived on the Eigeneaur Survey, owned his own place of about 60 acres which he acquired in 1929, same being out of the Doucette tract of 160 acres in the southwest corner of the survey. Fregia identified the several leases in evidence from the Slatterys to him, which leases covered all the Eigeneaur Survey except the Doucette 160 acres in the southwest corner; that Buck Markentell had his lease from the Slatterys on the land when he took over the pasture from Markentell; that he executed his first written lease with the Slatterys in 1935 when the Markentell lease he had taken over was up; that since his entry under the Markentell lease he had continuously, as a tenant of the Slatterys, until after

the death of Mayme Slattery, used said pasture and land as a tenant until the fence became dilapidated after the death of Mayme Slattery.

Plaintiffs' witness, Joe Doucette, testified that the Slattery folks had a little box house; Jube Doucette built it; that later on they had a pasture fenced on the Eigeneaur land of between 35 and 50 acres.

Anna Slattery testified that "our pasture fence" was built in July, 1924, by Buck Markentell and it was used as the pasture; that Markentell used the pasture we had, "the pasture we built;" that before the end of the Markentell lease Fregia took it over from Markentell about 1933. The witness identified the several leases made by the Slatterys to Fregia and the evidence showed that Fregia, during the period of the leases, kept his cattle in there and when asked to whether or not that is the pasture Markentell built, the witness answered that it was the same pasture. The witness also identified the leases of the Slatterys to Fregia of date September 22, 1937, of October 17, 1939 to March, 1946, and stated that Fregia was grazing his cattle and horses in there and that it was the same pasture that Buck Markentell helped build.

We hold that there was evidence in the record upon which the Markentell pasture could have been included in a judgment for defendants in the event a jury found favorably to defendants' limitation plea. Plaintiffs' point of error No. 1 is overruled.

■ We will next discuss defendants' points of error Nos. I, II and III in their application. These points complain of the holding of the Court of Civil Appeals that the evidence did not raise an issue to go to the jury on defendants' plea of a presumed grant from the heir, or heirs of Conrad Eigeneaur to their predecessors in title under whom defendants claim. The rule as to presumed grants is well stated in the case of Magee v. Paul, 110 Texas 470, 221 S.W. 254, 256 which is perhaps the leading case on the requirements for the application of the rule. It is there stated:

"Since it is not consistent with human experience for one really owning property of value to assert no claim thereto, but to acquiesce for a long period of time in an unfounded, hostile claim, the rule is sound which permits the inference that an apparent owner has parted with his title from evidence, first, of a long-asserted and open claim, adverse to that of the ap-

parent owner; second, of nonclaim by the apparent owner; and third, of acquiescence by the apparent owner in the adverse claim."

In Love v. Eastham, 137 Texas 462, 154 S.W. 2d 623, it is stated:

"The rule is generally referred to as the presumption of a deed or grant, but it seems to us it could be more accurately termed proof of title by circumstantial evidence. The rule has been given the most liberal interpretation and application by our courts."

It is also well established that a conveyance of land may be established by circumstantial evidence. Thompson v. Dutton, 96 Texas 205, 71 S.W. 544; Bounds v. Little, 75 Texas 316, 12 S.W. 1109. In Bruni v. Vidaurri, 1942, 140 Texas 138 (151-152), 166 S.W. 2d 81, this Court, in discussing presumed grant, said:

"* * * A case of presumed grant is not made merely by proof of long, adverse claim of ownership and proof of nonclaim on the part of the apparent owner. There must be evidence proving or tending to prove acquiescence by the apparent owner in the claim of the adverse party. Walker v. Caradine, 78 Texas 489, 493, 15 S.W. 31; Baldwin v. Goldfrank, 88 Texas 249, 258, 31 S.W. 1064; Stephens v. House, 112 Texas 459, 466, 467, 248 S.W. 30; Love v. Eastham, 137 Texas 462, 466, 154 S.W. 2d 623. We do not hold that direct evidence of acquiescence is required. Acquiescence may be shown by circumstantial evidence."

In order that a grant may be presumed, as set out in Magee v. Paul, supra, the first requisite is a long-asserted and open claim, adverse to that of the apparent owner. For the purposes of this discussion it will be assumed that the heirs of Conrad Eigeneaur, deceased, whatever their number or who they may be or might have been, were the owners of the record title.

The evidence, as above set out, shows the issuance of the patent to this land to the heirs of Conrad Eigeneaur in June, 1862. The first record of any assessment of this land is for the year 1867 when it was assessed to Conrad Eigeneaur by A. W. B. Thompson, Agent. This is the only assessment shown to C. Eigeneaur or to any heirs of Conrad Eigeneaur. Under Baker v. Fogle, 110 Texas 301, 217 S.W. 141, the assessment of the land thus shows knowledge on the part of the heirs of Conrad Eigeneaur that they at that time claimed to own this particular land. The assessment, from its designation, indicates a rendi-

tion of the land to the taxing authorities. In 1868, 1870 and 1871 the assessment records show this land to have been assessed to A. N. B. Tompkins, and not thereafter assessed to him. There was introduced in evidence upon the trial a deed by Charles A. Sterne to A. N. B. Tompkins conveying this land, and recorded in Liberty County September 21, 1871, which record was destroyed by the courthouse fire in 1874, but the deed was re-recorded in 1909. This deed plus the assessments support a claim to the land by A. N. B. Tompkins. In 1872 the land was assessed to Jas. B. Simpson. There being no further assessment of the land to Tompkins, its assessment to Simpson would support the finding that Tompkins had conveyed his title to Simpson. Jas. B. Simpson, by deed dated October 30, 1872, asserted ownership to this Eigeneaur Survey conveying 50 acres out of the northwest corner of said Survey to John T. Watson, and the assessment rolls of 1873 show this 50 acres assessed to Watson. In 1874, the land was assessed to Simpson. In 1876, 50 acre were assessed to Watson, and the balance was carried as unrendered. In 1875, the State of Texas filed suit in Liberty County and recovered judgment against Simpson for delinquent taxes on 500 acres of this land and some town lots in the City of Liberty. The judgment was satisfied by sale of the town lots. There is no assessment shown for the years 1875 and 1876. In 1877, Thomas Slattery received his deed to the Eigeneaur Survey and the town lots in Liberty, Texas, less the 50 acres in the northwest corner. This deed from the trustee in bankruptcy of the estate of James Chisholm et al, bankrupts, recited that the property conveyed was the same property "conveyed to said bankrupts by John A. Wallace." Slattery promptly sent his deed to the county clerk of Liberty County for recordation, and it was recorded in the deed records of said county about June 22, 1877.

B. F. Cameron was the county clerk of Liberty County at this time, and he had been county clerk for some years prior to the destruction of the courthouse and the records in 1874. In returning the original deed to Mr. Slattery, who at that time lived in New York State, Mr. Cameron wrote, "No one has assessed your land and paid taxes on it since Simpson sold to Wallace." As county clerk Cameron was familiar with the deed records as they existed before the fire. Cameron, as agent for Slattery, assessed the land in Slattery's name for the year 1878. Thomas Slattery, or his administrator, or heirs, paid taxes on this land from 1878 to 1893, although the original receipts introduced by the Slattery defendants showed the taxes for the years 1881-1882 and 1890 were not paid until after they were

delinquent. Thomas Slattery with his family moved to Liberty County, Texas, in 185, residing upon the two lots owned by him in the town of Liberty, Texas. However, there is evidence in the record that will support a finding of occupation, use and enjoyment of the 548 acres in the Eigeneaur Survey by Thomas Slattery and his heirs from 1885 or 1886 until 1894. The evidence shows that the heirs or representatives of Thomas Slattery paid taxes on the land before they became delinquent for the years 1924 to 1931 and 1935 to 1949. The defendants show no possession or taxes having been paid for 1894 until 1919, but from 1919 on they have used, occupied and enjoyed a part of the 548 acres either in person or through tenants and have claimed the whole tract. In 1885, a suit was filed in the district court of Liberty County, Texas, by J. W. Montgomery against Thomas Slattery and J. B. Simpson in which judgment was rendered against plaintiff, J. W. Montgomery, in favor of Thomas Slattery and J. B. Simpson "to all of said survey of land, and that Thomas Slattery holds and claims 657 acres, and J. B. Simpson 50 acres in the northwest corner."

The first claim to this land made by anyone as heirs of Conrad Eigeneaur was in the year 1895 when Von Rosenberg, acting under his power of attorney, dated in 1880, deeded the land to S. M. Johnson, who rendered the land for taxes in 1895 and 1896 but paid no taxes thereon. Wm. Fuchs succeeded to Johnson's rights by virtue of a judgment rendered in 1902; however, the defendants herein were not made parties. No occupation or use by those claiming under the Von Rosenberg title was made until the year 1909, when Stein received a deed from Fuchs and Jones. Stein put in a 15-acre field on the place and built a house thereon. Stein, through tenants, had possession of this field until 1924 when judgment in the Thompson Ford Lumber Company suit merged the Stein and Preacher titles. Thereafter, Stein and his assigns claimed title to the 200 acres awarded to him by this judgment.

The first assertion of title to any of the land in suit by the claimants under the Preacher claim was in 1903 or 1904. However, this claim was not under or through the heirs of Conrad Eigeneauer, the patentee, but adverse to their claim. After the merger of the Von Rosenberg and Preacher titles in 1923, the Preacher claimants claimed title to the 348 acres awarded them by virtue of the possession, use and occupancy of the 15-acre Coons or Pickett field by various tenants until 1941 when the then tenant, Gaston Lloyd, abandoned these premises.

Thus we see no claim was made by the purported Conrad

Eigeneaur heirs until 1895, and no possession asserted by them until 1909. From the year 1867 when the last assessment for taxes was made to Conrad Eigeneaur by A. W. B. Thompson, Agent, to 1895 no claim was made by the heirs of Conrad Eigeneaur to this land. In 1868 A. N. B. Tompkins was asserting ownership to this land adverse to the Eigenheaur heirs and in 1871 Tompkins recorded a deed to the property given to him by Charles A. Sterne. The next year—1872—Jas. B. Simpson was asserting claim to ownership by his rendition and the assessment of the land for taxes and he was asserting ownership by his deed to 50 acres to John P. Watson. In 1877, Thomas Slattery succeeded to the claim of Simpson through Wallace, through the trustee in bankruptcy, and in 1885 or 1886 went into possession of the land using it for a pasture, and there is evidence that he erected a house thereon and fenced at least a portion thereof. The land had the reputation in that county as being the Slattery land on through the years. E. B. Pickett, Jr. knew of the Slattery claim in 1904 when he fenced the land and took possession thereof through a tenant.

■ Since the acquiescence of the Eigeneaur heirs can be shown by circumstances, and since the possession of the Slattery defendants was of the open, notorious and adverse character necessary to impute knowledge, a jury issue was raised as to such acquiescence and the instruction of the verdict for plaintiffs was not justified. The assessment of taxes in 1867 is evidence of an assertion of a claim to the land by those claiming under the Eigeneaur heirs; in a like manner the discontinuance of the assessment after 1867 until 1909 is evidence of the abandonment of further claim to the land. Baker v. Fogle, supra. The assesment of the land in the names of others is evidence that those who were claiming the land in 1867 knew of and acquiesced in the claims of such others for the 28 years intervening until 1895. No suit was brought against those in possession under the Slattery title until this suit was filed in 1940 some 72 years after the first adverse claim in 1868, and within a few months after the death of Thomas Slattery's widow in 1939, and making her testimony no longer available. There is evidence connecting the defendants with the Jas. B. Simpson title first asserted in 1872.

■ We also hold that the evidence above set out is some evidence to raise the presumption of a deed or deeds from the heirs of Conrad Eigeneaur to the predecessors in title of the defendants, and such issue should have been submitted to a jury for their determination. Masterson v. Harris County Houston Ship Channel Nav. Dist., 1929, Texas Comm. App., 15 S.W. 2d 1011

(2, 3), 67 A.L.R. 1324; Lobley v. Gilbert, 149 Texas 493, 236 S.W. 2d 121; Miller v. Fleming, 149 Texas 368, 375, 233 S.W. 2d 571, 575. In the last case cited this Court quotes from the case of De Ramirez v. De Ramirez, Texas Civ. App., 29 S.W. 2d 872, wr. ref., as follows:

" 'Evidence need only lead to the conclusion that the grant might have been executed. Fowler v. Texas Exploration Co., (Texas Civ. App., 290 S.W. 818) and Miller-Vidor Lumber Co. v. Schreiber, (Texas Civ. App. 298 S.W. 154). A removal of all reasonable doubt is not essential. Brewer v. Cochran (45 Texas Civ. App. 179, 99 S.W. 1033). Only a fair probability of the existence of such title need be proved. Grayson v. Lofland (21 Texas Civ. App. 503, 52 S.W. 123). If the circumstances are consistent with the presumption that a sale or deed was made, and, in view of the circumstances, it is more reasonable to believe that such a sale or deed was made than that it was not made, the jury are at liberty to presume and find that it was made. Herndon v. Burnett (21 Texas Civ. App. 5, 50 S.W. 581) and Brugia v. Trueheart (48 Texas Civ. App. 513, 106 S.W. 736). It is sufficient if the evidence leads to the conclusion that the conveyance might have been executed and that its execution would be a solution of the difficulties arising from its nonexecution. Fletcher v. Fuller (120 U.S. 534, 7 Sup. Ct. 667, 30 L. Ed. 763) and Hutchison v. Massie, (Texas Civ. App., 226 S.W. 700).' "

The following quotation from the case of Pratt v. Townsend, Texas Civ. App., 125 S.W. 111, no writ history, is in point:

"* * * The doctrine of the presumption of the execution of a deed, or more properly the proof of its execution, by circumstances when no better evidence is obtainable is well established, and especially so by the decisions in this state, and the disposition has been to extend rather than to limit it. Taylor v. Watkins, 26 Texas 688; Baldwin v. Goldfrank, 88 Texas 249, 257, 31 S.W. 1064; Herndon v. Burnett, 21 Texas Civ. App. 25, 50 S.W. 582; Brewer v. Cochran, 45 Texas Civ. App. 179, 99 S.W. 1033; Frugia v. Trueheart, 48 Texas Civ. App. 513, 106 S.W. 737, 741; Harrison v. Frayar, 8 Texas Civ. App. 524, 28 S.W. 250. The destruction of the records in so many of the counties of this state, coupled with the carelessness, well nigh universal at an earlier period of our history, on the part of the people in keeping the original deeds after they had been recorded, and the disposition now so prevalent to uncover, by reason of carefully prepared abstracts of title, the absence of such written muniments of title as are necessary to make a com-

plete chain, require, in our opinion, a liberal application of this rule for the protection of titles long relied upon in good faith, the evidence of which has been lost through carelessness or accident, the destruction of records, and the death of all persons originally connected therewith, or likely to know anything about the facts. * * * "

At the time of the trial of this case in 1952 it had been more than 70 years since Thomas Slattery recorded his deed to this land and began his claim thereto. More than 60 years elapsed before any suit was brought by any adverse claimants. The early records of Liberty County had been destroyed by fire. Only one or two witnesses remained who had any personal knowledge of these early transactions.

Defendants' point of error IV and V are sustained. These points are that the Court of Civil Appeals erred in holding that there was no evidence to raise an issue to go to the jury as to whether or not defendants or their predecessors in title had the use and possession of any part of the land in suit, claiming the whole of said land except as to the 50 acres in the northwest corner, prior to any use and possession of same by plaintiffs or those under whom plaintiffs claim; and that there was no evidence to raise the issue as to title in plaintiffs to any part of the land under the doctrine of prior possession. The evidence raising these points has been heretofore discussed and will not be repeated here.

■ We now come to plaintiffs' Point 2 in their application. The Court of Civil Appeals held that plaintiffs, by merely filing their suit in 1940, did not interrupt the running of the statutes of limitation, but that it was necessary for plaintiffs to go further and show that "due diligence" was exercised by plaintiffs in securing issuance and service of process upon the several defendants. Plaintiffs' contention is stated by them as follows:

"Petitioners take the position that the commencement of a suit in trespass to try title by the owner of the record title in and of itself, without more, is sufficient to toll the statutes of limitation, provided there be a subsequent prosecution of said cause of action to final judgment, and that the matter of due diligence *vel non* in the issuance and service of citation is of no consequence as regards the date on which the running of the statute is tolled, such date being controlled solely and exclusively by the date of the filing of the petition."

Plaintiffs cite no authority for their position. We agree with the holding of the Court of Civil Appeals and this assignment of error is overruled.

Article 5514, Vernon's Annotated Texas Civil Statutes, first became a part of our laws in 1836 (Gammel's Laws of Texas, Vol. 1, p. 1216, Sec. 39) and the applicable part reads as follows: "* * * A peaceable possession can only be interrupted by an actual suit being instituted and prosecuted agreeably to the due forms of law, * * *." This language was changed by the last clause of the 14th section, Act. of Limitations, February 5, 1841, so as to read, "Peaceable possession, within the scope of this act, is such as is continuous, and not interrupted by adverse suit to recover the estate." Thus the requirement that the suit "be prosecuted agreeably to the due forms of law" was omitted. In Shields v. Boone, 22 Texas 193, it was contended that the omission of the last above quoted words from the Act of 1841 so changed the law as to require only the filing of a suit and not to require diligent prosecution thereof. The plaintiff had filed a suit for recovery of land and had done nothing further to prosecute his suit for nine months, and the court dismissed his suit. In discussing the omission of the words requiring suit "to be prosecuted agreeably to the due forms of law," the court said that the Legislature did not intend to change the rule that a suit must be prosecuted agreeably to the due forms of law.

Present Article 5514 reads, " 'Peaceable possession' is such as is continuous and not interrupted by adverse suit to recover the estate." This has the same meaning as that of the Act of 1841 construed in Shields v. Boone, supra. The Court of Civil Appeals has discussed this point in subheads (25) and (26) in the original opinion as modified by its discussion in subheads (30) and (31) on motions for rehearing, and we see no occasion to further lengthen this opinion by the duplication of such discussion and we approve this holding. As sustaining this holding see also the cases of Owen v. City of Eastland, 124 Texas 419, 78 S.W. 2d 178; Long-Bell Lumber Co. v. Bynum, 138 Texas 267, 158 S.W. 2d 290; Ricker v. Shoemaker, 81 Texas 22, 16 S.W. 645; City of Gainesville v. Harder, 139 Texas 155, 162 S.W. 2d 93 (1-3).

Judgment of the Court of Civil Appeals reversing and remanding the cause is affirmed, but on another trial, the trial court will be guided by this opinion.

Associate Justice Smith not sitting.

Opinion delivered November 14, 1956.

Rehearing overruled December 19, 1956.