**Ward HOWE et ux., Appellants,**

v.

**CITIZENS MEMORIAL HOSPITAL OF VICTORIA COUNTY, Texas et al., Appellees.**

**No. 343.**

Court of Civil Appeals of Texas.

Corpus Christi.

March 14, 1968.

Rehearing Denied April 18, 1968.

Utter & Chase, Carl Chase, Corpus Christi, Ellis & Andrews, Tom Andrews, Aransas Pass, for appellants.

Cullen, Mallette, Maddin, Edwards & Williams, Harry F. Maddin, Victoria, Wm. C. Sparks, Criminal Dist. Atty., R. Jeff Walker, Asst. Cr. Dist. Atty., Victoria, for appellees.

## OPINION

GREEN, Chief Justice.

At the close of the evidence on the trial of this cause, the court sustained motions for instructed verdict filed by defendants County of Victoria, Texas and Citizens Memorial Hospital of Victoria County, Texas, and by defendants Dr. George A. Constant and Dr. F. S. Ted Shields, withdrew the case from the jury, and rendered a take-nothing judgment. The plaintiffs Ward Howe and wife, Estelle Howe, have appealed.

Plaintiffs filed suit against the named defendants for damages resulting when Mrs. Howe fell from her bed in the psychiatric ward of defendant hospital about two hours after receiving a "glissando" or electrical shock treatment administered by Dr. Shields and a team of attending nurses. The motion for instructed verdict of Victoria County and defendant hospital was granted on their defense of governmental immunity. The motion of the doctor defendants was granted on the ground that the evidence introduced failed to show any actionable negligence on the part of said defendants. We shall consider the court's action on these two motions separately.

### APPEAL AS TO DOCTORS

Appellants have only one point of error in connection with their appeal so far as the doctor defendants are concerned. In this point together with the statement and argument thereunder appellants contend that the evidence raised fact issues within the allegations of their pleadings of negligence of the doctors proximately causing Mrs. Howe's injuries, and that the trial court erred in ruling otherwise. To this contention the doctors answered by reply points and argument that the trial court correctly granted their motion for instructed verdict because (1) appellants failed to prove actionable negligence on the part of either doctor and (2) appellants failed to plead or prove any special servant relationship between either doctor

and the hospital employees. By reason of the full discussion, argument and citation of authorities, the parties joined issue in the briefs on the proposition of whether appellants had plead and introduced evidence sufficient to raise a fact issue of actionable negligence on the part of defendant doctors proximately causing Mrs. Howe's injuries. McKelvy v. Barber, Tex. Sup.Ct., 381 S.W.2d 59, 62.

■ The trial court having sustained appellees' motion for instructed verdict and having withdrawn the case from the jury, the evidence in the record supporting the plaintiffs' position must be accepted as true and all conflicts and inconsistencies must be resolved in appellants' favor, and we must disregard all evidence and the inferences therefrom favorable to the appellees, and interpret the evidence and all reasonable inferences to be drawn therefrom most favorable to appellants. Hart v. Van Zandt, Tex.Sup.Ct., 399 S.W.2d 791, 793; Adams v. Slattery, 156 Tex. 433, 295 S.W.2d 859, 865; Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60, 61.

■ Under Texas authorities, the doctrine of res ipsa loquitur is not applicable to medical malpractice suits. Bell v. Umstattd, Tex.Civ.App., 401 S.W.2d 306, wr. dism.; Shockley v. Payne, Tex.Civ.App., 348 S.W.2d 775, wr. ref. n. r. e.; Hess v. Millsap, Tex.Civ.App., 72 S.W.2d 923; Barker v. Heaney, Tex.Civ.App., 82 S.W. 2d 417, wr. dism. Defendants' special exceptions to plaintiffs' plea of res ipsa loquitur were sustained by the trial court. Hence the burden was on plaintiffs to raise by evidence a fact issue or fact issues of negligence of defendant doctors proximately causing plaintiffs' injuries as such negligence was specifically plead by plaintiffs. Rules 67, 277 and 279, Texas Rules of Civil Procedure; Westinghouse Electric Corp. v. Pierce, 153 Tex. 527, 271 S.W.2d 422, 424; Parr v. Pichinson, Tex.Civ.App., 370 S.W.2d 941, wr. ref.;

Gunnells Sand Company v. Wilhite, Tex. Civ.App., 389 S.W.2d 596, wr. ref. n. r. e.

Dr. Constant's alleged liability in this suit is based on the doctrine of respondeat superior, it being allegde and proved that at all relevant times Dr. Shields was acting as the salaried agent and employee of Dr. Constant under instructions given by the latter, and within the course of his said employment and agency.

In connection with their suit against the doctor defendants, plaintiffs alleged as the specific acts of negligence proximately causing the injuries to Mrs. Howe, the following:

1. That the Defendant, F. S. Ted Shields, was negligent in failing to supervise and properly tie the glissando sheet on the Plaintiff at the time of the occurrence of the occasion in question.

2. That the Defendant, F. S. Ted Shields, failed to inspect such glissando sheet immediately after application of same on the Plaintiff at the time of the occurrence in question.

3. That Defendant, F. S. Ted Shields, failed to properly instruct the attendants assisting in the application of such glissando sheet at the time of the occurrence in question.

4. The Defendant, F. S. Ted Shields, failed to return to the room and inspect such glissando sheet applied to the Plaintiff before leaving the hospital in order to insure that such ties were properly placed at the time of the occurrence in question.

5. That the Defendant, F. S. Ted Shields, failed to instruct the attendants and nurses to apply to the bed restraining bedboards, or rails for the purpose of preventing the Plaintiff from falling from the bed at the time of the occurrence in question.

Taking into consideration the aforementioned legal principles applicable in an ap-

peal from a judgment based on an instructed verdict, and disregarding all evidence and the inferences therefrom favorable to defendants, and interpreting the evidence and all reasonable inferences to be drawn most favorable to plaintiffs, the record shows the following:

Dr. Constant is a qualified psychiatrist and neurologist, practicing his profession in Victoria and the surrounding area. At all times here relevant, he was the only psychiatrist on the staff of defendant hospital, and was in charge of the psychiatric ward on the fourth floor. This floor, with 26 rooms, was devoted primarily to mental cases, although at times of emergency patients with other ailments occupied rooms there. Dr. Constant was in charge of the training of the nurses and other hospital employees who attended to mental patients on this floor, and had his own "team" of hospital employees, trained by him and under his supervision who made the rounds with him and assisted him in giving prescribed psychiatric and neurological treatments.

Frequently it was necessary for Dr. Constant to be out of town, and he had employed Dr. Shields at a regular salary to make the hospital rounds for him on such occasions and with the help of his "team" of 4th floor nurses and attendants to supervise giving treatments as prescribed and ordered by Dr. Constant. Dr. Shields is a medical doctor but not a psychiatrist or neurologist. On the occasion in issue Dr. Constant was out of town, and Dr. Shields was acting within the scope of his said employment.

Plaintiff Mrs. Estelle Howe entered defendant hospital on January 11, 1963, as a patient of Dr. Constant. She was suffering from a schizzo-affective disorder and attending depression. A course of glissando therapy was prescribed for her by Dr. Constant to be given daily with some exceptions. This is a form of electric shock treatment given by the application of metal plates to the sides of the head, which plates are attached to an electrical device which regulates the amount of current administered to the patient. The treatment consists of three phases: (1) administration of medications to place the patient in a comatose condition during and for about four or five hours after the second phase; (2) electric shock therapy, in which the actual electric impulse is administered for only one second, but its severity causes the patient to go into violent muscular spasms for from forty to fifty seconds, during which time she is held on the bed by two members of the "team"; and (3) restraint of the patient for a period of about four or five hours until the effects of the shock treatment and medications have worn off. The record is emphatic as to the importance and necessity of the restraint phase of the treatment during the time that the patient remains in a confused, disoriented, drugged mental condition. Neither in their pleadings nor evidence do plaintiffs raise any issue of negligence with reference to the first two phases of the therapy mentioned above; their only complaint concerns phase three of the treatment, and deals with the alleged failure to properly restrain the patient after the shock had been applied to keep her from falling from her bed or otherwise injuring herself.

Restraining bed rails, although available, were not ordinarily used in the psychiatric ward by Dr. Constant to protect comatose drugged patients from falling out of bed. The manner of restraint used was what is known as a glissando sheet. This is made of heavy ducking with six ties on each side which, when placed over the patient in bed and *properly* attached and tied to the bed would, as testified to by the doctor defendants and other witnesses, prevent the patient from getting from under it and falling out of bed. According to testimony given by defendant doctors the patient would have been unable to release herself from this sheet during phase (3) had it been properly secured to the bed. As a part of the third phase of the therapy, the doctor in charge of ad-

ministering the treatment is to supervise the restraining of the patient. We quote from Dr. Constant as follows:

"Q Now you say that with these instructions that are given to the nurses after the treatment you instruct them to wrap them with a sheet of some kind?

*A We do that ourselves while we are still there."*

\*   \*   \*   \*   \*   \*

*"Q Is it usual and customary for the doctor in charge to tie that down?*

*A Well, he supervises it. He may help, usually we do."*

On January 22, 1963, at about 11:00 A.M. Mrs. Howe was given her ninth glissando since January 11, with Dr. Shields in charge. There were fourteen patients in the ward to receive such treatment, with plaintiff, due to the location of her room, as the twelfth patient. Medication was administered about an hour before the doctor and his team reached her room. The electrical impulse was duly given, the patient was held until she had completed her immediate convulsions, and the doctor and two of his team then left to get to the next patient without the doctor staying to help or supervise in the application of the restraining glissando sheet, as Dr. Constant had testified the doctor customarily did. Two members of the team remained behind to tie down the restraining sheet, and they then rejoined the doctor. At no time thereafter did the doctor go inside the room or inspect the patient Mrs. Howe before she fell. Nothing was said concerning the application of restraining bedboards for the purpose of preventing plaintiff, in her befuddled and confused state of mind, from falling. Dr. Shields left the hospital about 11:30 A.M.

At about 1:30 P.M., the nurses in an adjoining room heard a loud bump, and on going into Mrs. Howe's room found her lying on the floor with a broken hip and other serious injuries, and her mind still in a confused and disoriented condition. She remembered nothing as to what had occurred, this being not unusual for the medical testimony was that a patient after having been medicated and given the shock treatment such as she had gone through would probably remember nothing of what happened to her.

Plaintiffs' fifth ground of negligence as alleged was the failure of Dr. Shields to instruct the attendants and nurses to apply restraining bedboards or rails. Such boards were available if wanted. In connection with the use of such boards or rails Mrs. Swickheimer, a registered nurse of much experience in the treatment of psychiatric and neurotic patients and administrator of defendant hospital, testified by deposition as follows:

"Q Do you have an opinion based on your experience as to whether or not bed rails would reduce the probability of a person falling out of bed if they were used?

A The purpose of them is to keep a patient secure in their bed.

Q If I may paraphrase it, you say they do keep a patient in their bed?

A They do assist keeping a patient in their bed with a feeling of security.

Q Do you have an opinion as to whether or not it would be the best practice to put bed rails on the side of a bed of a person who is heavily sedated or medicated who did not know where they were or what they were doing and disoriented?

\*   \*   \*   \*   \*   \*

THE WITNESS: I think one point should be made here and that is bedrails are considered a part of the treatment.

Q I didn't hear you.

A Bed rails are considered part of treatment too. Are you asking for my opinion only?

Q  Yes, Ma'am.

A  I don't know how else to answer this.

Q  Strictly your opinion.

A  Bed rails are advisable.

Q  Under those conditions I have outlined?

A  Yes, I would accept those conditions."

Although both doctors testified that the glissando sheet, if *properly* secured to the bed, would restrain a patient in Mrs. Howe's condition and prevent her from falling therefrom, there was further testimony from experienced personnel of defendant hospital that it was common knowledge among the doctors and the nurses in the psychiatric ward that patients in Mrs. Howe's mental condition and drugged as she was on this occasion are frequented with hallucinations and are often quite cunning, and have been known to release themselves from the glissando sheet.

■ We have detailed some, though not all, of the evidence relied upon by plaintiffs to establish a fact issue or issues *within plaintiffs' pleadings* of negligence imputable to the doctors proximately causing Mrs. Howe to fall from her hospital bed and suffer her injuries resulting from such fall. Ordinarily, in malpractice suits against doctors, both negligence and proximate cause must be established by medical testimony of a doctor of the same school of practice as the defendant. Bowles v. Bourdon, 148 Tex. 1, 219 S.W. 2d 779, 13 A.L.R.2d 1; Hart v. Van Zandt, Tex.Sup.Ct., 399 S.W.2d 791. An exception ' to this rule has been recognized where the nature of the alleged malpractice and injuries are within the common knowledge of laymen, as where the negligence alleged to be the proximate cause of plaintiffs' injuries is in the use of mechanical or physical instruments, operating on the wrong portion of the body, leaving sponges in the body, or where

the fact issues are raised by the testimony of the defendant doctors. Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933; Maedgen v. Kolodny, Tex.Civ.App., 384 S.W.2d 410, wr. ref. n. r. e.; Dobbins v. Gardner, Tex.Civ.App., 377 S.W.2d 665, wr. ref. n. r. e.; Edwards v. West Texas Hospital, Tex.Civ.App., 89 S.W.2d 801, wr. dism.

Much of the evidence detailed above was given by the defendant doctors, and some which was corroborated by defendants in the main was given by long time experienced nurses of defendant hospital. We feel that all legal requirements of a prima facie cause of action against defendant doctors were established by the evidence and that, considering only that testimony most favorable to the plaintiff and discarding all the rest, fact issues of negligence proximately causing plaintiffs' injuries were raised. Hart v. Van Zandt, supra; Humphreys v. Roberson, Tex.Com. App., 83 S.W.2d 311, opinion adopted by Sup.Ct.; Edwards v. West Texas Hospital, supra; Dobbins v. Gardner, supra.

■ Appellees refer to testimony of the nurse Mrs. Smith introduced by defendants from her deposition after plaintiffs had read into evidence a small portion of this deposition, and say that because of such testimony the actions of Dr. Shields in connection with the tying of the glissando sheet could not be the proximate cause of Mrs. Howe's fall. Mrs. Smith testified in her deposition that Mrs. Howe had released herself from the sheet about 12:30, about an hour after the sheet had been tied, and had fallen from the bed without injury to herself, and that she, Nurse Smith, had then taken Mrs. Howe to the bathroom, and then to her bed where she, Mrs. Smith, had retied the sheet. This was, according to the witness, about an hour or so before Mrs. Howe fell again and suffered injuries here complained of. However, this testimony was not offered by the plaintiffs as a part of their case, but was placed in evidence

by defendants as a part of their defense. Plaintiffs are, therefore, not bound by it.

But if such testimony of Mrs. Smith should be considered on the issue of proximate cause, the inference is nevertheless to be drawn from all of the evidence, including that of the doctor defendants, that had the restraining sheet been properly tied, and had proper supervision been given to the tying of said sheet at the time phase (2) of the treatment was administered, Mrs. Howe would not have been able to release herself for a period of four or five hours and until she had come out of her comatose, befuddled condition.

We feel that the trial court erred in sustaining the motion of defendant doctors for an instructed verdict and in withdrawing the case against them from the jury. The judgment as, beween plaintiffs and the doctors is reversed and remanded.

### APPEAL AS TO HOSPITAL AND COUNTY

Plaintiffs, residents of Aransas Pass, San Patricio County, Texas, alleged that the hospital defendant was owned and operated by defendant County of Victoria, Texas, and that since said parties had the same interest in the suit, the two defendants would be referred to by plaintiffs as "Citizens Memorial Hospital".

Near the close of the evidence the parties entered into the following stipulation:

"MR. SPARKS: Let the record show that plaintiffs and defendants, Citizens Memorial Hospital, and the other defendants, have entered into this stipulation and say that the Citizens Memorial Hospital of Victoria, Texas was established and is maintained under the general laws of the state relating to such hospital and that it receives patients from all walks of life, of any nationality and of any church affiliation, whether such patients are able to pay for the treatment received. Said

hospital is not represented by any corporate stock. Under the laws of the State of Texas said hospital is placed under the management and control of a Hospital Board consisting of six citizens of said county, said Board having been appointed by the Commissioners Court of Victoria County.

"MR. ANDREWS: And further that the hospital does in the ordinary course of business accept patients who are not residents of Victoria County, Texas for treatment, and that such patients are charged the standard charges for services rendered to them the same as to any other persons who may be a patient in said hospital.

"That the per centage of persons receiving treatment from outside of Victoria County at Citizens Memorial Hospital at any given time would approximate five to ten per cent of the total patient load with regard to the hospital as a whole; and that approximately on any given date thirty per cent of the patients confined to the psychiatric ward of such hospital would be non residents of Victoria County and that they are accepted as patients and treated as patients in the same manner as patients who are residents of Victoria County who are not indigent."

Separate and distinct grounds of negligence and proximate cause as distinguished from those alleged against the doctors were alleged against hospital by plaintiffs. From our study of the statement of facts, we are convinced that fact issues were raised which should have been submitted to the jury except for hospital's defense of immunity. Plaintiffs' second point is that the court erred in ruling that the defendant hospital was operating in a governmental capacity and was not liable for its torts. Hospital's reply point is that it is an instrumentality of the State and is immune from tort liability. Plaintiffs in their discussion of their point of error narrow their contention and argument to

this question: "Does the governmental doctrine apply to county hospitals in the treatment of non-residents of the county?"

Title 71, Chapter 5, V.A.T.S., is the state law referred to in the stipulation and under the provisions of which defendant hospital was organized and operates. Article 4478 thereof empowers the commissioners court of any county to establish a county hospital. It proceeds to detail what must be done in order to set up and operate the hospital. Succeeding articles provide for the appointment of the Board of Managers by the Commissioners Court (4479) and for the naming of the Superintendent by the managers (4480). The powers of the Superintendent are stated in Art. 4485, which also provides what patients he *shall* receive into the hospital for medical care and attention, specifying among those who *shall* be received "any person found to be suffering from any illness, disease or injury, who has been an actual resident and inhabitant of the county for a period of at least one year prior to his application for admission to said hospital" and also persons sent by the commissioners court of any adjacent county under certain named circumstances. Article 4486 specifies certain other persons, residents of the county, who *shall* be admitted by the superintendent on qualifying under the limitations there set forth. These statutes obviously refer to people in the county and outside it who are entitled as a matter of right to be accepted as patients, their expenses to be paid as provided by Art. 4487.

■ Nowhere in these statutes is there any provision that the use of the county hospital is limited solely to residents of the county and to outsiders sent there under specifically named circumstances by commissioners courts of adjoining counties. The first sentence of Art. 4478 states as the purpose of establishing the hospital the treatment of persons suffering from any illness, disease or injury, subject to the provisions of Chapter 5, Title 71. There is nothing said in Chapter 5 which prohibits the Superintendent from furnishing the facilities of the hospital to a non-resident paying patient sent by a member of the medical staff. Dr. Constant was on the hospital staff. We are of the opinion and we therefore hold that defendant hospital was legally authorized to accept Mrs. Howe as a paying patient even though she was a resident of San Patricio County. The plaintiffs' pleadings and the stipulation and other evidence establish that defendant hospital is a governmental agency, and the law in Texas is well settled that not only a county but also such a governmental agency is immune from tort liability. Torres v. Aransas County Navigation District No. 1, et al, Tex.Civ.App., 346 S.W.2d 903, n. w. h., and authorities there cited; Torres v. Owens, et al, Tex.Civ. App., 380 S.W.2d 30, wr. ref. n. r. e.; Slocum v. Galveston County, Tex.Civ. App., 410 S.W.2d 487, wr. ref. n. r. e.; 15 Tex.Jur.2d, Counties, § 106, pp. 330 et seq., and authorities cited.

The trial court did not err in sustaining the motion for instructed verdict of the defendants County and Hospital, and in rendering a take-nothing judgment as to them, and the judgment in so far as it favors these two defendants is affirmed.

In view of our holding above, we do not find it necessary to pass upon the point argued by appellees hospital and county that such appellees would have immunity from liability in this case even if it be found that the agents of hospital were operating ultra vires or outside of statutory authority, see City of Dallas v. Smith, 130 Tex. 225, 107 S.W.2d 872, 879, opinion adopted by Sup.Ct.; Gartman v. City of McAllen, 130 Tex. 237, 107 S.W.2d 879, opinion adopted by Sup.Ct., and we make no further comments on this point.

The costs of appeal are assessed one half against appellants, one half against appellees Dr. Constant and Dr. Shields.

Affirmed in part, reversed and remanded in part.