Alvin Lee **MAEDGEN** et ux., Appellants,

v.

George Robert **KOLODNY**, Appellee.

No. 14399.

Court of Civil Appeals of Texas.

Houston.

Nov. 19, 1964.

Rehearing Denied Dec. 10, 1964.

Stanley F. Swenson, Houston, for appellant.

Fulbright, Crooker, Freeman, Bates & Jaworski, Newton Gresham, Blake Tartt, Houston, for appellee.

COLEMAN, Justice.

This is a medical malpractice case. The trial court withdrew the case from the jury and entered a verdict for the defendant. The question presented is whether the evidence was sufficient as a matter of law to raise a question of fact as to the existence of negligence on the part of appellee which was the proximate cause of the damage suffered by appellant.

Appellant, Mrs. Maurice Maedgen, was afflicted with a condition known as Ptosis of the right upper eyelid, characterized by abnormal drooping to the extent that it covered practically all of the right eye. She was unable to maintain the eyelid in an open position by use of the levator muscle normally employed in raising and lowering one's eyelid.

Dr. George Robert Kolodny undertook to improve this condition by a fascia-lata sling-type operation, by which support is given the upper eyelid by attaching it to the occipital frontalis muscles of the forehead by means of a strip of fascia-lata tissues from the patient's thigh. He testified that it is a relatively simple matter to so adjust the strips of fascia-lata that the lower edge (tarsal plate) of the upper lid will cover the desired portion of the eye. It was his testimony that at the conclusion of the operation he had placed the lid in a position covering the upper one-third of the cornea. He further testified that when such an operation is a complete success the lid, in forward gaze, covers the upper third of the cornea and cannot come down in downward gaze. In upward gaze, the lid remains immobile also. Movement of the lid can be attained only by an upward wrinkling of the forehead. The cornea is the transparent tissue which blends into the white part of the eye, or sclera, and covers the iris, or colored part of the eye. The unaccustomed exposure of the eye, caused by the operation, tends to cause the development of corneal ulcers. To combat the drying effect of constant exposure of the cornea, the doctor prescribed drops of

methacellulose in the eye three or four times a day.

The doctor testified that after the operation, so far as a layman could tell, the right eye was open the same amount as the left eye. The operation was performed August 11, 1960 and appellant was released from the hospital on August 22. The doctor saw her again on August 29 and found the lid in excellent position and she was doing very well when he saw her on September 26. On January 4, 1961, he found that she had a marginal ulcer on her eye at the three o'clock position. He saw her for the last time on January 10, at which time he found that the ulcer had healed. A marginal ulcer consists of a disruption of the epithelium near the edge of the cornea, or an infiltration of white cells into the stroma of the cornea, which may build up to the point that they come to the surface of the cornea. The medical testimony was to the effect that the term "marginal ulcer", as used in the profession, did not refer to exposure ulcers, but that the cause of their appearance was not definitely known. Appellee testified that little points of inflamation of the cornea, called punctate keratitis, do come about from exposure of the cornea. He also testified that corneal ulcers may be caused by trauma and that if the eye is open things get into it more readily. He testified that an exposure ulcer could become very severe to the extent that it would penetrate the eye and cause its loss, but in such a case the ulceration would be most severe in the lowermost part of the cornea because it would be the most exposed. He stated that if the eyelids do not close during sleep, exposure keratitis may develop. He wrote in the hospital records that on August 17 and 19 his examinations revealed that the lid was in an excellent position. He testified that the position in which he found the lid on those dates was exactly the position he had placed it and desired it to be.

Dr. Russell Wolfe, an ophthalmologist, was called as a witness by Mrs. Maedgen. He first saw her May 27, 1961, at which time she had a very extensive ulceration of the right cornea, covering two-thirds of the cornea. Because of its crucial importance to the case, his testimony will be reviewed extensively. He testified that the condition would have taken a long time to develop since it looked rather invalid and chronic, but that it was a condition that might develop in a few days. In answer to a hypothetical question as to whether he had an opinion based on reasonable medical probability as to the cause of the condition of the eye which he saw, he stated that he did have an opinion and that he thought "it was due to the drying-out of the cornea, because of its more or less chronic or permanent exposure to air. * * * If it were wide open to the air during day light hours. * * * during her waking hours * * that would be enough to cause the trouble." He testified that on the first day he saw her the position of Mrs. Maedgen's eyelid was high, though he could not say just where it was positioned. The right eye was much more open than the left. He further testified, in answer to a question as to whether ophthalmologists in Harris County would perform an operation, such as Mrs. Maedgen had, in such a manner as to seek to place the tarsal plate of the upper eyelid at or slightly above the limbus, that he didn't think anybody would deliberately plan an operation to leave the cornea exposed that much for long periods of time, and that it would be contrary to good surgery and to the usual and ordinary standards of care of ophthalmologists of Harris County, Texas, to actually and deliberately so place a lid as to expose the cornea at all times.

Dr. Lowe testified that on March 20, 1961, he examined Mrs. Maedgen and found the fissure of her right eye considerably more open than that of her left eye. She had a marginal corneal ulcer of the right eye at the 10 o'clock position visible without raising the eyelid. The upper lid was at about the upper limbus and that the limbus was the area where one can see no further colored part of the eye. He did not remember that there was any reddening of

the eyeball or anything in addition to the corneal ulcer. During his treatment of Mrs. Maedgen his tests revealed that the lid was placed at a point too high for her reflex action during sleep, called Bell's phenomena, to completely roll the cornea of her right eye under the lid. This is one way in which the eyeball of a normal person is kept moist. He testified that he last saw her on May 19, 1961, and that the position of her right eyelid was exactly the same as when he first saw her. He testified that if as the result of an operation an eye was kept from being thoroughly lubricated or watered, an exposure ulcer could come at any time. "Most likely it would come sometime, probably sometime at the beginning you ought to see some signs of an exposure ulcer * * *"

Dr. Sylvan Brandon undertook the treatment of Mrs. Maedgen's eye on June 1, 1961. He testified that exposure of the cornea shouldn't be the result of the operation which was performed on Mrs. Maedgen and that "the operation is not done, ever, this way, so as to leave the cornea exposed."

Dr. Wendell D. Gingrich testified that when the corneal surface of the eye dries there gets to be a haze of corneal substance, then a sore spot where there is wrinkling of the epithelium and vision becomes increasingly poor to the extent that it is lost. He testified that drying can cause corneal ulcers and that if the eye cannot be closed it is more apt to sustain trauma from external sources than a normal eye. His tests on Mrs. Maedgen's eye determined that she was suffering from a fungus ulcer. A corneal transplant was attempted and the eye was treated under his supervision, but so much of the eye was opaque that her vision was greatly impaired and will not improve. He testified that when he saw Mrs. Maedgen it was not possible for him to say whether or not the ulcer was related to the ptosis operation nor whether the operation was or was not skillfully done. Under the date of August 30, 1961, he wrote in the hospital records: " * * * Lids

do not close completely. Upper lid too high for complete protection * * *"

Miss Evelyn Stewart testified that she visited Mrs. Maedgen in the hospital and found her asleep. Her left eye was closed, but her right eye was wide open to the extent that she could see white all around the colored part of the eye.

Miss Butterworth, a former employee of Mrs. Maedgen, testified that she visited her in the hospital and continued to work for her in her florist business until August, 1960. She stated that when she first saw Mrs. Maedgen's eye after the operation in question "the right eye was open considerably more than the other eye, enough so that the entire pupil showed, and it seems like some of the white showed around it, but the whole pupil did. Anyway, it is more than a normal eye is open — sort of a starey effect." She further testified that when Mrs. Maedgen was looking straight ahead, her eyelid was above the iris.

Mrs. Plowman, the sister of Mrs. Maedgen, testified that the first time she saw her sister's right eye after the patch was removed was a few days after she got out of the hospital. She stated that the right eyelid was above the color of the eye and that she could see some of the white of the eye between the coloring and the lid and that until she had further treatment the position of the lid stayed about the same.

Similar testimony concerning the position of the lid was given by Mrs. Maedgen and by her husband. Mr. Maedgen testified that there was no change in the position of the eyelid from the time he first saw it after the operation while his wife was in the hospital until it was operated on again.

It is argued that the evidence of the lay witnesses as to the position of the eyelid with reference to the colored portion of the eye concerns matters within the field of medical testimony and, therefore, lacks probative force. We are unable to agree with this contention. The testimony given was factual in nature and did not involve

medical opinion. A non-expert witness may give his opinion on questions of apparent conditions of the body or mind. Shuffield v. Taylor, 125 Tex. 601, 83 S.W.2d 955, opinion adopted.

It is also contended that the testimony related to the condition as it existed some days, weeks, or months after the operation, and that since there was medical testimony that the position of the lid can change from many causes, the testimony lacked probative force as establishing the position at which the lid was placed by Dr. Kolodny during the operation. Dr. Kolodny testified that he placed the lid at a position covering the upper one-third of the cornea and that it remained in that position at the time he last saw her. There was no direct testimony that the position of the lid did change by reason of scarring or otherwise prior to the time the eye was seen by these witnesses. While the only direct evidence concerning the placing of the lid by Dr. Kolodny was his own testimony, a jury could properly infer from the evidence of its position a few days after the operation that it was placed in that position by the doctor. Woodward v. Ortiz, 150 Tex. 75, 237 S.W.2d 286. This inference would, of course, be supported by the testimony that the lid remained in the same position for some months after the operation. The doctor was an interested witness and his testimony, even though uncontradicted by other direct testimony, would not be binding on appellants.

The testimony of the lay witnesses alone was not sufficient to require the submission of the case to the jury. The Supreme Court of Texas has determined that a patient has no cause of action against his doctor for malpractice, unless he proves by a doctor of the same school of practice, with certain exceptions, as the defendant, that the treatment complained of constituted negligence and that it was the proximate cause of the patient's injuries. Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 13

A.L.R.2d 1; Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933.

Insofar as negligence is concerned the necessary medical testimony was supplied by the appellant. Humphreys v. Roberson, 125 Tex. 558, 83 S.W.2d 311, opinion adopted. However the necessary proof of proximate cause is more nebulous. The medical testimony establishes that the danger to be anticipated from constant exposure lies in the possibility of drying out of the corneal surface resulting in exposure keratitis and exposure ulcers. There is no medical testimony that either of these conditions resulted other than the testimony of Dr. Wolfe. There was testimony that the condition causing the loss of vision was a fungus infection. There was medical testimony that the exposed condition of the eye created greater likelihood of objects getting into the eye with resultant traumatic injury, but there was no direct medical testimony that the fungus infection resulted from appellant's inability to close her eye. There was medical testimony that inability to lower the upper eyelid, and some degree of exposure of the eye, were the expected results of this operation, and there was no medical testimony that the additional exposure caused by placing the lid at or above the colored portion of the eye, rather than over the upper one-third of the cornea, resulted in the corneal ulcer.

While Dr. Wolfe testified that it was his opinion, based on reasonable medical probability, that the ulcer he saw in appellant's right eye on May 27, 1961, was due to drying out of the cornea because of its more or less chronic or permanent exposure to air, he testified on cross-examination that many people with normal lids develop corneal ulcers because some agent gets into their eyes from the atmosphere and causes the ulcer. There was no testimony of a traumatic injury to Mrs. Maedgen's eye. He said that if after the operation Mrs. Maedgen was free from trouble for several months he could not say conclusively that the ulcer was caused by the operation, and

that he would not be prepared to state with medical certainty that the ulcer was a result of an exposure following the operation. He also testified, on cross-examination, that the ulcer could have been caused by drying out of the cornea, or from trauma, or some other cause, and that he could not say which. He then said: "I had a very definite opinion at the time, but I couldn't back it up * * *. I would have said that, at this time, we might expect it from a cornea that had been exposed." He then said that he was not certain of it. He further testified he was not aware of the likelihood of fungus ulcerations of the eye when he treated Mrs. Maedgen, and that fungus could have been the cause of the ulceration, and was more likely to have been the cause in one with her condition than in one with normal eyelids.

Considering all of this testimony, a jury could properly conclude that Dr. Wolfe was of the opinion, based on medical probability, that the ulcer with which Mrs. Maedgen was afflicted when he treated her resulted from constant exposure caused by the operation, although he was not certain of it and could not testify with medical certainty that the ulcer did not result from some other cause. While the question is not free from doubt, we think this testimony, bolstered by the circumstance that prior to the operation Mrs. Maedgen had never had any trouble with ulcers in her eyes, and that after the operation she had no soreness or ulceration of the left eye, meets the test for proximate causation stated by the Supreme Court of Texas in Porter v. Puryear, 262 S.W.2d 933.

Finally, there is considerable testimony by Mrs. Maedgen of mental anguish by reason of her appearance, described by lay witnesses as "starey," "terrible," and "horrible" prior to the subsequent surgery closing the eye completely. While there is no medical testimony that mental anguish could be anticipated as a result of the alleged malpractice, under the particular facts of this case we are of the opinion that the existence of mental anguish as a direct and proximate result of the negligence of appellee was a matter for the determination of the jury. Dobbins v. Gardner, Tex.Civ.App., 377 S.W.2d 665, ref., n. r. e.; Gorsalitz v. Harris, Tex.Civ. App., 360 S.W.2d 574.

The judgment is reversed and the cause is remanded to the trial court.